T.C. Memo. 1996-3

UNITED STATES TAX COURT

ELIZABETH B. MILLER, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

ROBERT N. MILLER III, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 23465-93, 23558-93.    Filed January 11, 1996.

Ward R. Nyhus, Jr., for petitioners.

Steven M. Roth, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined the following defi-
ciencies under section 2501(a)[1] in petitioners' Federal gift tax:

---

[1]  All section references are to the Internal Revenue Code (Code)
(continued...)

| Petitioner | Year[2] | Deficiency |
|---|---|---|
| Elizabeth B. Miller | 1989 | $31,500 |
| Robert N. Miller III[3] | 1989 | 31,500 |

The issues remaining for decision in these cases are:

(1)  Was each of the two $50,000 transfers that petitioner Elizabeth B. Miller[4] made during 1982 to her son Stephen Miller a transfer by gift for purposes of section 2501(a)?  We hold that it was.

(2)  Was the $100,000 transfer that petitioner Elizabeth B. Miller made during 1982 to her son Robert N. Miller IV a transfer by gift for purposes of section 2501(a)?[5]  We hold that it was.

---

[1](...continued)
in effect for the years relevant to the transactions at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  By virtue of the operation of the unified credit under sec. 2505, respondent determined deficiencies for 1989 even though the basis for those deficiencies relates to transfers made during 1982.

[3]  Respondent's determinations against petitioner Robert N. Miller III, who is and was during the years relevant to the transactions at issue the spouse of petitioner Elizabeth B. Miller, result solely from his being treated as having made gifts by operation of sec. 2513(a)(1).  Under that section, a gift by one spouse to a third person is treated as made one-half by that spouse and one-half by the spouse of that spouse, provided that both spouses have consented to such treatment as provided in sec. 2513(a)(2) and (b).

[4]  Hereinafter, references to petitioner are to Elizabeth B. Miller.

[5]  Petitioner issued a $100,000 check to Robert N. Miller IV on Oct. 4, 1982.  That check was not presented for payment until January 1983.  Petitioners do not claim, and respondent does not
(continued...)

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Santa Barbara, California, at the time the petitions were filed.

During all years relevant to the transactions at issue, petitioners operated an agricultural business known as Thornhill Ranches on property of the same name that was owned by petitioner and located in southern California. During those years, petitioners, operating as Thornhill Ranches, employed their two sons Stephen Miller (Stephen) and Robert N. Miller IV (Robert) to assist them in managing the business and determined the salaries and bonuses that they received.[6] During those same years, petitioners also owned and operated a commercial property business located in Georgia that their son Robert helped manage.

Throughout the period 1982 through 1985, petitioner retained the accounting firm of Pannell, Kerr, and Forster (PKF) to maintain her financial records and to prepare her Federal gift

---

[5](...continued)
contend, that the transfer to Robert N. Miller IV was made in 1983 rather than 1982. We therefore accept the parties' agreement that petitioner made the $100,000 transfer to Robert N. Miller IV in 1982.

[6] Stephen and his wife filed joint Federal income tax returns for the years 1982 through 1985 in which they reported gross income, including wages and salaries, that ranged from approximately $64,000 to $73,000. Robert filed individual Federal income tax returns for the years 1982, 1984, and 1985 in which he reported gross income, including wages and salaries, that ranged from approximately $79,000 to $90,000.

tax returns. During those years, Lesile Delmarter (Mr. Delmarter), a certified public accountant employed by that firm, was responsible for the supervision and performance of those services. In providing those services to petitioner, employees of PKF, including Mr. Delmarter, relied on the records, such as check registers, check stubs, bank statements, and canceled checks, that petitioner forwarded to PKF relating to her financial transactions. Mr. Delmarter and other employees of PKF followed whatever characterization petitioner had reflected in those records as to the nature of her transactions and did not independently determine whether those characterizations accurately reflected the nature of those transactions. For example, if petitioner had noted on a check stub that a check she wrote was a loan, Mr. Delmarter and other employees of PKF accepted that notation as accurately indicating the purpose for which that check was written.

Petitioner's Transfer to Stephen

Petitioner transferred $100,000 to her son Stephen by giving him two $50,000 checks on June 18, 1982, and on September 9, 1982, respectively. Petitioner wrote the word "loan" on the check register and the check stub, respectively, for those checks, and she sent those check records to PKF. Because petitioner had written the word "loan" on those records, on December 31, 1982, PKF recorded each of the $50,000 checks petitioner

issued to Stephen in an account labeled "Notes Receivable--S. Miller" in petitioner's general ledger.[7]

Petitioner gave[8] Stephen the two $50,000 checks in question in response to his request for her assistance in paying off a mortgage in the approximate amount of $56,000 that encumbered the house that he and his wife had purchased in 1980 for $300,000 and that became due in 1982. In November 1982, Stephen used approximately $56,000 of the $100,000 that he received from petitioner in order to retire that mortgage.

In connection with petitioner's issuance of the two $50,000 checks to Stephen, he signed a non-interest-bearing note dated September 14, 1982 (September 1982 note) in the principal amount of $100,000 that was payable to petitioner. Although petitioner was generally familiar with the concept of secured obligations, she did not request Stephen to secure that note, and it was not secured, by real property or any other collateral.

The September 1982 note provided that Stephen was to pay petitioner $100,000 on demand or on September 14, 1985, if no demand was made. In other words, pursuant to the terms of that

---

[7] While Mr. Delmarter was responsible for supervising PKF's maintenance of petitioner's financial records, other individuals employed by PKF made the actual entries in those records to reflect petitioner's financial transactions.

[8] The use herein of the words "gave", "note", "obligation", "loan", "principal", "forgiveness", "indebtedness", and similar words does not reflect the Court's view of the substance of the transactions at issue.

note, if petitioner did not demand payment from Stephen prior to September 14, 1985, he was to pay her the principal amount in all events on that date. (Hereinafter, the date of September 14, 1985, that was stated in the September 1982 note will sometimes be referred to as the due date of that note.)

At the time Stephen signed the September 1982 note, petitioner believed that the date on which he was to pay her the principal amount was open, and she did not consider the September 14, 1985 date stated in that note to be a fixed date on which Stephen was in all events to pay her the principal amount. Furthermore, at that time, she had no intention of demanding payment on September 14, 1985, or on any other date, and there was no discussion between petitioner and Stephen as to what, if any, consequences would result in the event he did not make the payment required by the terms of the September 1982 note.

Petitioner did not make a written or oral request of Stephen to repay the September 1982 note on or after September 14, 1985. Petitioner and Stephen had no discussions on or after the due date of the September 1982 note with respect to a possible extension of the time within which he was to pay off that note or as to any other matter relating to that note.

On November 29, 1982, Stephen made a $15,000 payment to petitioner, which was documented by a receipt signed by petitioner. Stephen made no other payments to petitioner during the three-year period following the date on which he signed the

September 1982 note. Stephen did not make an offer of repayment or an actual repayment of the September 1982 note on or after September 14, 1985, the date on which it was in all events payable. Even though Stephen failed to pay off the September 1982 note on its due date, petitioner never instituted legal proceedings or took other steps to enforce repayment.

Rather than requesting Stephen to pay off the September 1982 note, at or near the various dates set forth below, petitioner wrote and delivered a letter (forgiveness letter) to him in which she stated that, as of the date of the letter, she was "reducing the principal balance" of the September 1982 note by the amount stated in the letter. The date of each forgiveness letter to Stephen and the reduction of the "principal balance" (amount forgiven) stated in each such letter was as follows:

| Date of Letter | Amount Forgiven |
|----------------|-----------------|
| Dec. 20, 1982 | $5,000 |
| Aug. 5, 1983 | 5,000 |
| Jan. 22, 1984 | 15,000 |
| Mar. 31, 1985 | 15,000 |
| Jan. 3, 1986 | 15,000 |
| Feb. 9, 1987 | 5,000 |
| Jan. 6, 1988 | 20,000 |
| Jan. 3, 1990 | 5,000 |
| Total | 85,000 |

Petitioner determined the amount forgiven that was stated in each of the forgiveness letters to Stephen by reference to the total amount that petitioner and her husband were permitted to give him in a particular year without the imposition of Federal

gift tax, after taking account of the annual exclusion provided by section 2503(b) and the gift-splitting provisions of section 2513(a)(1).

In an undated letter that petitioner wrote to Stephen, and that Stephen signed on February 6, 1987 (February 1987 letter to Stephen), petitioner summarized the amounts that she considered paid as of January 3, 1986, with respect to the $50,000 check that she had issued to him on June 18, 1982, as follows:[9]

|              |         |
| ------------ | ------- |
| Aug.  5, 1983 | $2,500 |
| Jan. 22, 1984 | 7,500  |
| Mar. 31, 1985 | 7,500  |
| Jan.  3, 1986 | 7,500  |

Petitioner made no reference in the February 1987 letter to Stephen to the $50,000 check that she had issued to him on September 9, 1982.  Petitioner omitted from that letter the $5,000 amount forgiven that was stated in her forgiveness letter dated December 20, 1982.  Nor did that letter refer to any portion of the $15,000 payment that Stephen had made to her on November 29, 1982.  Stephen reviewed that letter prior to signing it.  However, he did not notice, or question the reasons for, those omissions.

PKF recorded a $15,000 credit and a $10,000 credit to the "Notes Receivable--S. Miller" account in petitioner's general

---

[9]  In determining the amounts petitioner considered paid by Stephen as of Jan. 3, 1986, she applied one-half of each amount forgiven that was stated in each of the forgiveness letters for the years 1983, 1984, 1985, and 1986 to the $50,000 check that she had issued to him on June 18, 1982.

ledger on December 31, 1982, and on December 31, 1983, respectively. No other credit entries were made to that account during the period 1982 through 1989.

Petitioner filed a Federal gift tax return for 1982 that was prepared by PKF. That return did not reflect as a gift to Stephen the $5,000 amount forgiven that was stated in the forgiveness letter to him dated December 20, 1982. Petitioner did not file Federal gift tax returns for the years 1983 through 1986. Petitioner filed Federal gift tax returns for the years 1987 through 1990. Petitioner's 1987 Federal gift tax return showed a $20,000 gift to Stephen as a result of forgiveness of indebtedness, while her forgiveness letter to him for that year stated that the amount forgiven was $5,000. Petitioner's 1988 Federal gift tax return showed a cash gift of $20,000 to Stephen and no gift as a result of forgiveness of indebtedness, while her forgiveness letter to him for that year stated that the amount forgiven was $20,000. Petitioner's 1989 Federal gift tax return showed a $20,000 gift to Stephen as a result of forgiveness of indebtedness, but petitioner sent no forgiveness letter to him during that year.

Petitioner's Transfer to Robert

On October 4, 1982, petitioner gave a check in the amount of $100,000 to her son Robert. Petitioner wrote the word "loan" on the check stub for that check, and she sent that check stub to PKF. Because petitioner had written the word "loan" on that

check stub, on September 30, 1983, PKF recorded the $100,000 check petitioner issued to Robert in an account labeled "Note Receivable--B. Miller" in petitioner's general ledger.

Having assisted Stephen in connection with his acquisition of real property and wishing equivalent treatment for her son Robert, petitioner encouraged Robert to acquire his first house and offered him $100,000 to assist in that acquisition. In addition to the $100,000 that Robert had received from petitioner, as of October 4, 1982, he had approximately $100,000 that was invested in various checking, savings, and security accounts.

On January 21, 1983, Robert acquired a house for $185,000 by paying almost $170,000 in cash and assuming the seller's existing mortgage of about $16,000. As of the date of the purchase of the house, Robert's gross assets consisted of his newly acquired house and approximately $30,000 that was invested in checking, savings, and securities accounts.

In connection with the issuance by petitioner of the $100,000 check to Robert, he signed a non-interest-bearing note dated October 4, 1982 (October 1982 note) in the principal amount of $100,000 that was payable to petitioner. Although petitioner was generally familiar with the concept of secured obligations, she did not request Robert to secure that note, and it was not secured, by real property or any other collateral.

The October 1982 note provided that Robert was to pay petitioner $100,000 on demand or on October 4, 1985, if no demand was

made.  In other words, pursuant to the terms of that note, if petitioner did not demand payment from Robert prior to October 4, 1985, he was to pay her the principal amount in all events on that date.  (Hereinafter, the date of October 4, 1985, that was stated in the October 1982 note will sometimes be referred to as the due date of that note.)

Petitioner wanted to treat both her sons Stephen and Robert in the same or essentially the same manner.  Thus, the terms of the October 1982 note signed by Robert were very similar to the terms of the September 1982 note signed by Stephen.  At the time Robert signed the October 1982 note, there was no discussion between petitioner and Robert as to what, if any, consequences would result in the event he did not make the payment required by the terms of the note, and he did not expect to repay the entire principal amount of $100,000 by October 4, 1985.

Petitioner did not make a written or oral request of Robert to repay the October 1982 note on or after October 4, 1985. Petitioner and Robert had no discussions on or after the due date of the October 1982 note with respect to a possible extension of the time within which he was to pay off that note or as to any other matter relating to that note.

Robert made no payments to petitioner with respect to the October 1982 note during the three-year period following the date on which he signed that note.  Nor did he repay that note on or after October 4, 1985, the date on which it was in all events

payable.  Even though Robert failed to repay the October 1982 note on its due date, petitioner never instituted legal proceedings or took other steps to enforce repayment.

Rather than requesting Robert to pay off the October 1982 note, at or near the various dates set forth below, petitioner wrote and delivered a letter (forgiveness letter) to him in which she stated that, as of the date of the letter, she was "reducing the principal balance" of the October 1982 note by the amount stated in the letter.  The date of each forgiveness letter to Robert and the reduction of the "principal balance" (amount forgiven) stated in each such letter was as follows:

| Date of Letter | Amount Forgiven |
| --- | --- |
| Jan. 22, 1984 | $15,000 |
| Mar. 31, 1985 | 15,000 |
| Jan.  3, 1986 | 15,000 |
| Feb.  9, 1987 | 15,000 |
| Jan.  6, 1988 | 20,000 |
| June 16, 1989 | 20,000 |
| Total | 100,000 |

In addition, in an unsigned letter to Robert dated April 9, 1983 (unsigned forgiveness letter to Robert), petitioner stated that, as a part of her 1982 annual gift to Robert, she was "reducing the principal balance" of the October 1982 note by $10,000 ($10,000 amount forgiven).

Petitioner determined the amount forgiven that was stated in each of the forgiveness letters to Robert and the $10,000 amount forgiven that was stated in the unsigned forgiveness letter to

him by reference to the total amount that petitioner and her husband were permitted to give him in a particular year without the imposition of Federal gift tax, after taking account of the annual exclusion provided by section 2503(b) and the gift-splitting provisions of section 2513(a)(1).

In an undated letter that petitioner wrote to Robert, and that Robert signed on February 5, 1987 (February 1987 letter to Robert), petitioner summarized the amounts that she considered paid as of January 3, 1986, with respect to the $100,000 check that she had issued to him on October 4, 1982, as follows:

| | |
|---|---|
| Jan. 22, 1984 | $15,000 |
| Mar. 31, 1985 | 15,000 |
| Jan. 3, 1986 | 15,000 |

Petitioner omitted from the February 1987 letter to Robert the $10,000 amount forgiven that was stated in the unsigned forgiveness letter to him.

PKF recorded a $10,000 credit to the "Note Receivable--B. Miller" account in petitioner's general ledger on December 31, 1983. No other entries were made to that account during the period 1982 through 1989.

Petitioner filed a Federal gift tax return for 1982 that was prepared by PKF. The $10,000 amount forgiven that was stated in the unsigned forgiveness letter to Robert was not reflected as a gift to Robert in petitioner's 1982 Federal gift tax return. Petitioner did not file Federal gift tax returns for the years 1983 through 1986. Petitioner filed Federal gift tax returns for

the years 1987 through 1989.  Each of those returns showed a gift to Robert resulting from forgiveness of indebtedness.  Petitioner's 1987 Federal gift tax return showed a $20,000 gift to Robert as a result of forgiveness of indebtedness, while her forgiveness letter to him for that year stated that the amount forgiven was $15,000.

## OPINION

Petitioners bear the burden of proving that respondent's determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners have attempted to satisfy their burden of proof in these cases through testimonial and documentary evidence. With respect to the testimonial evidence, petitioner testified on her own behalf.  Her self-serving testimony was at times vague, conclusory, internally inconsistent, and contradicted by documentary evidence.  Although petitioner maintained throughout her testimony that she intended the transfers at issue to be loans, her recollection of specific matters pertaining to those transfers was poor or at best hazy.  In an attempt to corroborate petitioner's testimony, petitioners presented the testimony of their sons Stephen and Robert.  Their respective testimony, which was intended to serve the interests of their parents, also was at times vague, conclusory, internally inconsistent, and/or contradicted by documentary evidence.  Under the circumstances presented here, we are not required to, and we do not, accept the

testimonial evidence presented by petitioners to sustain their burden of establishing error in respondent's determinations.  See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  With respect to the documentary evidence, certain documents in the record contradict other documents and/or testimony.  Under such circumstances, we are not required to, and we do not, rely on the documentary evidence presented by petitioners to sustain their burden of showing error in respondent's determinations.

Section 2501(a)(1) generally imposes a tax for each calendar year on the transfer of property by gift during such year by an individual.  Although the Code does not explicitly define what constitutes a gift for purposes of section 2501(a)(1), section 2512(b) provides:  "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift".  Section 25.2511-1(g)(1), Gift Tax Regs., provides in pertinent part:

> Donative intent on the part of the transferor is not an essential element in the application of the gift tax to the transfer.  The application of the tax is based on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor. * * *  The gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth, or to ordinary business transactions, described in §25.2512-8.

The parties agree that petitioner transferred $100,000 to each of her sons during 1982. The only dispute here is whether the transfers at issue were loans or gifts. Petitioners contend that each of those transfers was in form and in substance a loan, and not a gift, for Federal gift tax purposes because petitioner entered into a bona fide creditor-debtor relationship with each of her sons at the time of such transfers.[10] Respondent contends that although each of the transfers at issue was, in form, a loan that purported to establish such a relationship, in substance, each such transfer was a gift.

The question whether a taxpayer has entered into a bona fide creditor-debtor relationship pervades the Federal tax law. See, e.g., Estate of Maxwell v. Commissioner, 98 T.C. 594, 603-604 (1992), affd. 3 F.3d 591 (2d Cir. 1993); Estate of Kelley v. Commissioner, 63 T.C. 321, 325 (1974); Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). "Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift". Harwood v. Commissioner, 82 T.C. 239, 258 (1984) (citing Estate of Reynolds v. Commis-

_____

[10] Although petitioners' argument is not entirely clear, they appear to contend that under Dickman v. Commissioner, 465 U.S. 330 (1984), only the interest foregone on demand loans, and not the principal of such loans, may be considered a gift for Federal gift tax purposes. Petitioners' reliance on Dickman is misplaced, since Dickman requires a finding of a bona fide debt. That is the precise issue presented in these cases.

sioner, 55 T.C. 172, 201 (1970)), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). That presumption may be rebutted by an affirmative showing that at the time of the transfer the transferor had a real expectation of repayment and an intention to enforce the debt. Estate of Van Anda v. Commissioner, supra at 1162. The mere promise to pay a sum of money in the future accompanied by an implied understanding that such promise will not be enforced is not afforded significance for Federal tax purposes, is not deemed to have value, and does not represent adequate and full consideration in money or money's worth. See Estate of Maxwell v. Commissioner, supra at 604-605; Estate of Musgrove v. United States, 33 Fed. Cl. 657, 664 (1995).

The determination of whether a transfer was made with a real expectation of repayment and an intention to enforce the debt depends on all the facts and circumstances, including whether: (1) There was a promissory note or other evidence of indebtedness, (2) interest was charged, (3) there was any security or collateral, (4) there was a fixed maturity date, (5) a demand for repayment was made, (6) any actual repayment was made, (7) the transferee had the ability to repay, (8) any records maintained by the transferor and/or the transferee reflected the transaction as a loan, and (9) the manner in which the transaction was reported for Federal tax purposes is consistent with a loan. See Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); Montgomery v. United States, 87 Ct. Cl. 218, 229, 23 F. Supp.

130, 136 (1938); <u>Estate of Maxwell v. Commissioner</u>, <u>supra</u> at 604; <u>Estate of Kelley v. Commissioner</u>, <u>supra</u> at 323-324; <u>Rude v. Commissioner</u>, 48 T.C. 165, 173 (1967); <u>Clark v. Commissioner</u>, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953); <u>Estate of Van Anda v. Commissioner</u>, <u>supra</u> at 1162-1163; <u>Estate of Musgrove v. United States</u>, <u>supra</u> at 664-665. No one factor may be determinative. See <u>Estate of Maxwell v. Commissioner</u>, <u>supra</u> at 604.

With the foregoing factors in mind, we turn to the facts and circumstances surrounding each of the transfers at issue to determine whether at the time of each such transfer petitioner entered into a bona fide creditor-debtor relationship with each of her sons.

1.  <u>Whether There Was a Promissory Note or Other Evidence of Indebtedness With Respect to the Transfers at Issue</u>

Stephen and Robert signed notes, dated September 14, 1982, and October 4, 1982, respectively, stating that they promised to repay the $100,000 that petitioner transferred to each of them during 1982. See, e.g., <u>Estate of Van Anda v. Commissioner</u>, <u>supra</u> at 1162.

2.  <u>Whether Interest Was Charged on the September 1982 Note and the October 1982 Note</u>

Neither the September 1982 note signed by Stephen nor the October 1982 note signed by Robert was to bear interest. See, e.g., <u>Clark v. Commissioner</u>, <u>supra</u> at 783.

3.  Whether There Was Any Security or Collateral for
    the September 1982 Note and the October 1982 Note

Petitioner transferred $100,000 to each of her sons to assist them in connection with their respective acquisitions of real property.[11]  Neither the September 1982 note signed by Stephen nor the October 1982 note signed by Robert was secured by the real property each acquired.  Indeed, petitioner never even asked Stephen and Robert to secure their respective notes by that real property or by any other collateral.  See, e.g., Estate of Musgrove v. United States, supra at 664.

4.  Whether There Was a Fixed Maturity Date for the
    September 1982 Note and the October 1982 Note

The September 1982 note signed by Stephen stated that he was to pay petitioner $100,000 on demand or on September 14, 1985, if no demand was made.  At the time Stephen signed the September 1982 note, petitioner believed that the date on which he was to pay her the principal amount was open, and she did not consider the September 14, 1985 date stated in that note to be a fixed date on which Stephen was in all events to pay her the principal amount.  Furthermore, at that time, she had no intention of demanding payment on September 14, 1985, or on any other date,

---

[11]  Petitioner transferred $100,000 to Stephen in order to assist him in satisfying in 1982 a mortgage of approximately $56,000 that he and his wife assumed at the time that they purchased a house in 1980.  Neither petitioner nor Stephen explained why she transferred $100,000 to him when he needed only about $56,000 to satisfy that mortgage.

and there was no discussion between petitioner and Stephen as to what, if any, consequences would result in the event he did not make the payment required by the terms of the note. In fact, despite Stephen's failure to remit the payment due under the September 1982 note on its due date, petitioner made no request of Stephen to repay that amount on or after that date, and they had no discussions on or after September 14, 1985, with respect to a possible extension of time within which he was to pay off that note or as to any other matter relating to that note. See, e.g., Clark v. Commissioner, supra at 783.

Although the October 1982 note signed by Robert was not part of the record in these cases, the record establishes that the terms of that note were very similar to the terms of the September 1982 note signed by Stephen; that is to say, the October 1982 note signed by Robert stated that he was to pay petitioner $100,000 on demand or on October 4, 1985, if no demand was made. The record further establishes that petitioner wanted to treat both her sons Stephen and Robert in the same or essentially the same manner. Thus, we infer that petitioner's intentions and expectations with respect to both notes were, or were virtually, identical; that is to say, we infer that at the time Robert signed the October 1982 note, petitioner believed that the date on which he was to pay her the principal amount was open, she did not consider the October 4, 1985 date stated in that note

to be a fixed date on which Robert was in all events to pay her the principal amount, and she had no intention of demanding payment on October 4, 1985, or on any other date. The record establishes that at the time Robert signed the October 1982 note, there was no discussion between petitioner and Robert as to what, if any, consequences would result in the event he did not make the payment required by the terms of the note, and he did not expect to repay the entire principal amount of $100,000 by October 4, 1985. In fact, despite Robert's failure to remit the amount due under the October 1982 note on its due date, petition-er made no request of Robert to repay that amount on or after that date. Nor did they have any discussions on or after October 4, 1985, with respect to a possible extension of time within which he was to pay off that note or as to any other matter relating to that note. See, e.g., Clark v. Commissioner, 18 T.C. at 783.

5. Whether a Demand Was Made for Repayments of the September 1982 Note and the October 1982 Note

At the time of each of the transfers at issue, there was no discussion between petitioner and either of her sons regarding the circumstances that would arise if either son defaulted on the note each signed. Although each of the notes in question that was signed by Stephen and Robert, respectively, stated that petitioner had the right to demand repayment of the principal balance of each such note throughout a three-year period follow-

ing the date on which each such note was signed, the record does not establish whether petitioner made such a demand for repayment during that three-year period. The record does establish, and we have found as a fact, that petitioner made no demand for repayment of the principal balance of each such note on its due date (viz., September 14, 1985, in the case of the September 1982 note and October 4, 1985, in the case of the October 1982 note) or at anytime thereafter. Stephen did not offer to repay the principal balance of the September 1982 note on or after its due date. The record does not establish whether Robert made an offer to repay the principal balance of the October 1982 note on its due date. Petitioner did not discuss with either of her sons the possibility of extending the due date of each of the notes in question.

Based on our review of the entire record before us, we find that on the respective dates on which Stephen signed the September 1982 note and Robert signed the October 1982 note petitioner did not expect them to carry out their respective obligations stated in those notes. In addition, although neither Stephen nor Robert carried out those obligations, petitioner did not institute legal proceedings or take any other steps to enforce repayment of those notes. See, e.g., Rude v. Commissioner, 48 T.C. at 173.

6.    Whether There Were Actual Repayments With Respect to the September 1982 Note and the October 1982 Note

Except for one $15,000 payment in 1982, Stephen made no payments to petitioner after he signed the September 1982 note. See, e.g., Estate of Maxwell v. Commissioner, 98 T.C. at 604.

As for the $15,000 payment, Stephen paid that amount to petitioner on November 29, 1982, approximately two months after petitioner had given him a second check for $50,000. Neither petitioner nor Stephen was able to explain why he paid petitioner $15,000 approximately two months after she had transferred to him during 1982 an additional $50,000. The record is also unsatisfactory as to why petitioner transferred a total of $100,000 to Stephen when he needed only approximately $56,000 during 1982 to pay off an outstanding mortgage on his house. Moreover, petitioner testified that the $15,000 payment that Stephen made to her on November 29, 1982, was a partial repayment with respect to the two $50,000 transfers she had made to him on June 18, 1982, and September 9, 1982, respectively. However, petitioner made no reference to any portion of that payment in the February 1987 letter to Stephen in which she summarized the amounts she considered paid as of January 3, 1986, with respect to the $50,000 transfer she had made to him on June 18, 1982, and he raised no questions about that omission when he signed that letter. Based

on the state of the record in these cases, we do not place any particular weight on the $15,000 payment that Stephen made to petitioner on November 29, 1982, in resolving whether petitioner made a gift or a loan to Stephen for Federal gift tax purposes.

Robert did not repay any portion of the October 1982 note he signed.  See, e.g., Estate of Maxwell v. Commissioner, supra at 604.

7.    Whether Stephen and Robert Had the
      Ability To Repay Their Respective Notes

With respect to Stephen, except for the house that he and his wife purchased in September 1980 for $300,000, the record does not contain any information relating to his assets at the time petitioner made each of the two $50,000 transfers to him during 1982 or at any time thereafter.  During 1982, Stephen retired a mortgage that encumbered his house in the approximate amount of $56,000.  Although that fact indicates that Stephen had some equity in his house, the record does not disclose whether that equity, alone or in conjunction with his other assets, would have been sufficient to repay the $100,000 petitioner transferred to him during 1982.  Even if we were to assume that Stephen had sufficient equity in his house which, alone or together with his other assets, would have enabled him to repay that amount, there

is no indication in the record that petitioner would have required him to sell or refinance his house for that purpose.

It is also significant that the gross income reported by Stephen and his wife in their joint Federal income tax returns for the years 1982 through 1985 ranged from approximately $64,000 to $73,000. Stephen testified that his income was to be the source of repayment. However, the record does not establish that Stephen's income during the years 1982 through 1985 was sufficient not only to cover all his personal living expenses, his other expenses, and his income tax liabilities, but also to permit him to accumulate sufficient assets to repay no later than September 14, 1985, the $100,000 petitioner transferred to him in 1982.

On the record before us, petitioners have failed to establish that at the time in 1982 when petitioner transferred $100,000 to Stephen she reasonably believed that he would be able to repay that amount on demand or on September 14, 1985, if petitioner made no demand prior to that date. See, e.g., Zimmerman v. United States, 318 F.2d at 613.

With respect to Robert, in addition to the $100,000 that he had received from petitioner, as of October 4, 1982, he had approximately $100,000 that was invested in various checking, savings, and securities accounts.  On January 21, 1983, Robert acquired a house for $185,000 by paying almost $170,000 in cash and assuming the seller's existing mortgage of about $16,000.  As of the date of the purchase of the house, Robert's gross assets consisted of his newly acquired house and approximately $30,000 that was invested in checking, savings, and securities accounts. Although Robert had equity of about $170,000 in his newly acquired house, there is no indication in the record that petitioner would have required him to sell or refinance his house to repay the $100,000 she transferred to him in 1982.  Robert's liquid assets of about $30,000 would not have been sufficient to satisfy a demand for repayment of $100,000.

It is also significant that Robert's gross income for the years 1982, 1984, and 1985, as reflected in his Federal income tax returns for those years, ranged from approximately $79,000 to $90,000.  Robert testified that his income was to be the source of repayment.  However, the record does not establish that Robert's income during the years 1982 through 1985 was sufficient not only to cover his personal living expenses, his other expenses, and his income tax liabilities, but also to permit him to

accumulate sufficient assets to repay no later than October 4, 1985, the $100,000 petitioner transferred to him in 1982.  In fact, although Robert testified that he believed at the time petitioner transferred $100,000 to him that he was obligated to repay that entire amount by October 4, 1985, he also testified that he probably would not have repaid that entire amount by that date.[12]

On the record before us, petitioners have failed to establish that at the time in 1982 when petitioner transferred $100,000 to Robert she reasonably believed that he would be able to repay that amount on demand or on October 4, 1985, if petitioner made no demand prior to that date.  See, e.g., Zimmerman v. United States, supra at 613.

8.    Whether Any Records of Petitioner and/or Her Sons
      Reflected Each of the Transfers at Issue as a Loan

Certain records relating to the transfers at issue that were maintained by petitioner or on petitioner's behalf are, or are in part, consistent with petitioners' position in these cases that those transfers were loans that petitioner forgave over the period 1982 through 1990 and with other evidence in the record.

---

[12]  Robert further testified that while he would have been able to repay by Oct. 4, 1985, a substantial portion of the $100,000 petitioner transferred to him, he believed he could have obtained an extension of time from her within which to repay the remainder of that amount.

By way of illustration, petitioner wrote the word "loan" on the check register and the check stub, respectively, for the two $50,000 checks she issued to Stephen during 1982 and on the check stub for the $100,000 check she issued to Robert during that year. Petitioner sent those check records to PKF, and PKF recorded the transfers to Stephen and Robert in petitioner's general ledger in accounts labeled "Notes Receivable--S. Miller" and "Note Receivable--B. Miller", respectively. In addition, on December 31, 1982, and on December 31, 1983, PKF recorded a $15,000 credit and a $10,000 credit, respectively, to the "Notes Receivable--S. Miller" account in petitioner's general ledger. Those entries correspond to the $15,000 payment that Stephen made to petitioner on November 29, 1982, and the $10,000 total of the $5,000 amount forgiven that was stated in each of the forgiveness letters to Stephen dated December 20, 1982, and August 5, 1983. On December 31, 1983, PKF also recorded a $10,000 credit to the "Note Receivable--B. Miller" account in petitioner's general ledger. That entry corresponds to the $10,000 amount forgiven that was stated in the unsigned forgiveness letter to Robert.

Petitioner's designation as to the character of the transfers at issue and any other actions relating to those transfers is not necessarily indicative of their substance. See Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974).

Nor do PKF's entries in petitioner's general ledger lend credence to petitioner's contention that the transfers at issue were loans that petitioner forgave over the period 1982 through 1990. Those entries merely reflected the labels that petitioner placed on those transfers and related actions and were not based on any independent research conducted by PKF to ascertain whether the substance of such transfers and actions was consistent with petitioner's characterization of them.

It is also significant that the general ledger maintained for petitioner by PKF is in part inconsistent with petitioner's position here and with other evidence in the record. No other credit entries were recorded in the accounts in petitioner's general ledger labeled "Notes Receivable--S. Miller" and "Note Receivable--B. Miller". Yet the record herein contains forgiveness letters to Stephen and to Robert, respectively, in which petitioner purports to forgive stated portions of the respective amounts each of them allegedly owed her.

Other inconsistencies in the evidence relating to the transfers at issue cast further doubt on whether those transfers were genuine loans. By way of illustration, in the February 1987 letter to Stephen in which petitioner summarized the amounts that she considered paid as of January 3, 1986, with respect to the $50,000 transfer she had made to him on June 18, 1982, petitioner

did not refer to any portion of the $15,000 payment that Stephen had made to her on November 29, 1982. However, she testified that some portion of that payment was made with respect to that transfer. Petitioner also omitted from the February 1987 letter to Stephen the $5,000 amount forgiven that was stated in her forgiveness letter to him dated December 20, 1982. In the February 1987 letter to Robert in which petitioner summarized the amounts that she considered paid as of January 3, 1986, with respect to the October 1982 note, petitioner omitted the $10,000 amount forgiven that was stated in her unsigned forgiveness letter to him. In addition, while petitioner transferred $100,000 to Robert, the amounts forgiven stated in the forgiveness letters to him and the $10,000 amount forgiven stated in the unsigned forgiveness letter to him totaled $110,000.[13]

9. <u>Whether the Manner in Which Each of the Transfers at Issue Was Reported for Federal Tax Purposes Is Consistent With a Loan</u>

Assuming arguendo that each of the transfers by petitioner to her sons had been a loan, a portion of which she forgave over

_____

[13] Petitioners attempt to explain the discrepancies involving Robert by contending that petitioner did not intend the unsigned forgiveness letter to him dated Apr. 9, 1983, to be effective. However, petitioner led PKF to believe that that letter was effective, since, based on information she provided to that accounting firm, on Dec. 31, 1983, it recorded a $10,000 credit to the "Note Receivable--B. Miller" account in petitioner's general ledger.

a period of time, the amounts so forgiven would have constituted a transfer by gift for Federal gift tax purposes. See Estate of Kelley v. Commissioner, 63 T.C. at 326. Although petitioner treated each of the transfers at issue as a loan, and not as a gift, for Federal gift tax purposes, she did not consistently report as gifts for Federal gift tax purposes the amounts forgiven in excess of $10,000 that were stated in the forgiveness letters to Stephen and to Robert.[14] See, e.g., Zimmerman v. United States, 318 F.2d at 613; cf. Estate of Kelley v. Commissioner, supra at 323. By way of illustration, petitioner did not file Federal gift tax returns for any of the years 1984 through 1986. However, in each of those years, petitioner wrote forgiveness letters addressed to each of her sons in which she indicated that $15,000 was the amount forgiven.

For the years 1987 and 1988, petitioner filed Federal gift tax returns in which she reported as forgiveness of indebtedness and thus as gifts amounts that were different from the amounts forgiven that were stated in the forgiveness letters to Stephen and/or to Robert for those years. For example, with respect to

---

[14] In the case of a transfer by gift, a Federal gift tax return must be filed unless the dollar amount transferred to each donee is $10,000 or less and is thus excluded under sec. 2503(b), the transfer is excluded as a qualified educational or medical expense under sec. 2503(e), or the transfer is to a spouse for which a deduction is allowed under sec. 2523. Sec. 6019(a).

Stephen, the forgiveness letter addressed to him dated February 9, 1987, stated an amount forgiven of $5,000, while the Federal gift tax return filed on behalf of petitioner for 1987 reported a $20,000 gift to Stephen as a result of forgiveness of indebtedness.  With respect to Robert, the forgiveness letter addressed to him dated February 9, 1987, stated an amount forgiven of $15,000, while the Federal gift tax return filed on behalf of petitioner for 1987 reported a $20,000 gift to Robert as a result of forgiveness of indebtedness.

Based on our examination of the entire record in these cases, we find that petitioners have not established that petitioner entered into a bona fide creditor-debtor relationship with either of her sons at the time of the transfers at issue.  We further find that petitioners have failed to satisfy their burden of proving that the transfers at issue constituted loans and not gifts as determined by respondent.  We therefore sustain respondent's determinations in these cases.

To reflect the foregoing and petitioners' concessions,

<u>Decisions will be entered for respondent</u>.