T.C. Memo. 2006-115


UNITED STATES TAX COURT


ESTATE OF LILLIE ROSEN, DECEASED,
ILENE FIELD AND HERBERT SILVER, CO-PERSONAL REPRESENTATIVES,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF LILLIE ROSEN, DECEASED, DONOR,
ILENE FIELD AND HERBERT SILVER, CO-PERSONAL REPRESENTATIVES,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 7575-04, 7576-04.       Filed June 1, 2006.


<u>Marvin A. Kirsner</u>, <u>Daniel D. Mielnicki</u>, <u>G. Michelle
Ferreira</u>, and <u>Jerome M. Hesch</u>, for petitioners.

<u>John T. Lortie</u>, <u>Kenneth A. Hochman</u>, and Jennifer Duval
(specially recognized), for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  In docket No. 7575-04, the Estate of Lillie
Rosen, Deceased, Ilene Field and Herbert Silver, Co-Personal
Representatives, petitioned the Court to redetermine respondent's
determination of a $1,107,085 deficiency in the Federal estate
tax of the Estate of Lillie Rosen (decedent's estate).  In docket
No. 7576-04, the Estate of Lillie Rosen, Deceased, Donor, Ilene
Field and Herbert Silver, Co-Personal Representatives, petitioned
the Court to redetermine respondent's determination of a $25,826
deficiency in the 2000 Federal gift tax of Lillie Rosen
(decedent).  The cases resulting from these petitions were
consolidated for purposes of trial, briefing, and opinion.

Following concessions by the parties and a trial of the
remaining issues, we decide whether decedent retained the
possession or enjoyment of, or the right to the income from,
property transferred to the Lillie Rosen Family Limited
Partnership (LRFLP) with the result that the property is
includable in her gross estate under section 2036(a)(1).[1]  We
hold she did.  Given this holding, we need not and do not
consider respondent's other arguments in support of respondent's

---

[1] Unless otherwise indicated, section references are to the
applicable versions of the Internal Revenue Code.  Rule
references are to the Tax Court Rules of Practice and Procedure.

determination that the property is includable in decedent's gross estate.

FINDINGS OF FACT

1. Preface

Some facts were stipulated, and the stipulated facts are incorporated herein by this reference. Herbert Silver (decedent's son) and Ilene Field (decedent's daughter) (collectively, decedent's children) are co-personal representatives of decedent's estate. When the petitions were filed in these cases, decedent's son resided in Coconut Creek, Florida, and decedent's daughter resided in Wilmette, Illinois.

2. Decedent and Her Family

Decedent was born on November 17, 1907, and she died on July 14, 2000, at the age of 92. Decedent's children are her only children. Decedent's son is married to Greta Silver (decedent's daughter-in-law), and their children are Benita Silver Levin, Alan Silver, and Daniel Silver. Decedent's daughter is married to Gerson Field (decedent's son-in-law), and their children are Andra Kossy and Debra Levens. As of December 5, 2005, decedent's son was 74 years old, decedent's daughter was 70 years old, and they each had been married for 50 years.

3.  Practice of Law by Decedent's Son-in-Law and Decedent's
    Formal Gift-Giving Program

Decedent's son-in-law has practiced as an attorney for more than 50 years, and he has regularly attended seminars on estate planning and the Federal estate tax.  Throughout his practice, he has advised decedent on various legal matters including establishing a formal plan to make gifts to her descendants and their spouses (collectively, descendants).  Decedent's wealth consisted primarily of stocks, bonds, and cash.  Decedent's son-in-law most likely recommended the formal plan of gift giving as a form of estate planning.

In 1979, decedent began the formal gift-giving plan under which she (in her own capacity or apparently after 1994 through her daughter as decedent's attorney-in-fact) generally gave her descendants gifts in each of the ensuing years until her death.  Before 1995, decedent and her daughter usually met once a year in Chicago to select any particular stock or bond that would be given to each donee descendant.  Decedent's son-in-law kept records detailing these gifts.  In 1995 and 1996, decedent (through her daughter as decedent's attorney-in-fact) gave cash to her then 16 descendants as follows:[2]

---

[2] We note that Jacob Silver and Benjamin Silver each received $5,000 a year in 1995 and 1996, while all of the other listed individuals who were not decedent's children each received $10,000 a year.  We are unable to find the reason the two named individuals were treated differently.

| Date of Gift | Donee | Relationship to Decedent | Gift |
|---|---|---|---|
| 12/31/95 | Decedent's son | Son | $15,000 |
| 12/31/95 | Decedent's daughter | Daughter | 25,000 |
| 12/31/95 | Decedent's son-in-law | Son-in-law | 10,000 |
| 12/31/95 | Decedent's daughter-in-law | Daughter-in-law | 10,000 |
| 12/31/95 | Alan Silver | Grandson | 10,000 |
| 12/31/95 | Daniel Silver | Grandson | 10,000 |
| 12/31/95 | Andra Kossy | Granddaughter | 10,000 |
| 12/31/95 | Debra Levens | Granddaughter | 10,000 |
| 12/31/95 | Benita Silver Levin | Granddaughter | 10,000 |
| 12/31/95 | David Kossy | Grandson-in-law | 10,000 |
| 12/31/95 | Gary Levens | Grandson-in-law | 10,000 |
| 12/31/95 | Marcus Levin | Great-grandson | 10,000 |
| 12/31/95 | Benjamin Silver | Great-grandson | 5,000 |
| 12/31/95 | Jacob Silver | Great-grandson | 5,000 |
| 12/31/95 | Rachael Kossy | Great-granddaughter | 10,000 |
| 12/31/95 | Nicole Levens | Great-granddaughter | 10,000 |
| 1/1/96 | Decedent's son | Son | 15,000 |
| 1/1/96 | Decedent's daughter | Daughter | [1]-0- |
| 1/1/96 | Decedent's son-in-law | Son-in-law | 10,000 |
| 1/1/96 | Decedent's daughter-in-law | Daughter-in-law | 10,000 |
| 1/1/96 | Alan Silver | Grandson | 10,000 |
| 1/1/96 | Daniel Silver | Grandson | 10,000 |
| 1/1/96 | Andra Kossy | Granddaughter | 10,000 |
| 1/1/96 | Debra Levens | Granddaughter | 10,000 |
| 1/1/96 | Benita Silver Levin | Granddaughter | 10,000 |
| 1/1/96 | David Kossy | Grandson-in-law | 10,000 |
| 1/1/96 | Gary Levens | Grandson-in-law | 10,000 |
| 1/1/96 | Marcus Levin | Great-grandson | 10,000 |
| 1/1/96 | Benjamin Silver | Great-grandson | 5,000 |
| 1/1/96 | Jacob Silver | Great-grandson | 5,000 |
| 1/1/96 | Rachael Kossy | Great-granddaughter | 10,000 |
| 1/1/96 | Nicole Levens | Great-granddaughter | 10,000 |

[1] On Jan. 1, 1996, in lieu of a cash gift, decedent gave her daughter a $25,010 "other gift", the specifics of which we are unable to find.

4. Decedent's Trust

On June 18, 1974, decedent formed a revocable trust known as the Lillie Sachar Rosen Investment Trust, a.k.a. Lillie Investment Trust (Lillie Investment Trust). Decedent was the trustee and settlor of the Lillie Investment Trust, and decedent's children were named in the underlying document (trust document) as successor cotrustees. The trust document stated that decedent would "transfer certain cash and securities to the trustee" and that the "trustee agrees that she will hold the cash

and securities and all other property, real and personal, acquired by her as trustee hereunder, including any property acquired under the provisions of settlor's will, upon the trusts hereinafter set forth."  The trust document required that all of the trust's income be distributed to (or on behalf of) decedent at least once every 3 months, and it allowed decedent, as trustee, to distribute to herself some or all of the trust's principal.  The trust document stated that all principal and undistributed income at the time of decedent's death would be distributed in the following order:  (1) To pay certain expenses and claims related to decedent (to the extent that decedent did not have assets outside of the Lillie Investment Trust to pay those amounts); (2) $40,000 to a trust benefiting decedent's mother, if living; (3) $5,000 to each of decedent's living grandchildren; (4) $1,500 to certain charitable organizations; and (5) one-half of any remaining amount in the Lillie Investment Trust to each of decedent's children (or, if deceased, to the benefit of his or her spouse and children).  The trust document set forth an extensive list of the duties and powers of the trustee.

The terms of the Lillie Investment Trust were amended three times.  First, on January 1, 1981, the terms of the Lillie Investment Trust were amended to state that decedent had changed her residence and domicile from Illinois to Florida effective as

of that date.  Second, on January 1, 1982, the terms of the Lillie Investment Trust were amended to state that the trustee could buy, sell, or trade securities on margin.  Third, on August 23, 1989, the terms of the Lillie Investment Trust were amended upon the advice of decedent's estate planning attorney, Stuart Feldman (Feldman), to restate the terms of the Lillie Investment Trust by revoking all of the then-existing provisions and replacing them with new ones.  In relevant part, the new provisions changed the order and amounts of distributions to be made upon decedent's death and stated specifically that decedent's children would serve as successor cotrustees in the event decedent was unable to manage her affairs.  The new provisions also stated:

> I [decedent] shall be considered to be unable to manage my affairs if I am under a legal disability or by reason of illness or mental or physical disability am unable to give prompt and intelligent consideration to financial matters, and the determination as to my inability at any time shall be made by my son, HERBERT J. SILVER, and daughter, ILENE FIELD, and the trustee may rely upon written notice of that determination.

The provisions of the Lillie Investment Trust, both before and after each amendment, allowed decedent (or any successor trustee) to control and manage her assets and to make gifts to her descendants as desired.  Also on August 23, 1989, Feldman prepared a will for decedent that listed her children as the co-personal representatives of her estate.

5. <u>Decedent's Powers of Attorney</u>

On May 26, 1993, decedent signed an Illinois power of attorney, naming her daughter as her attorney-in-fact with respect to the handling of decedent's property.[3]  This document was effective May 26, 1993, and set forth a list of powers that decedent's daughter had in her capacity as decedent's attorney-in-fact with respect to the handling of decedent's property. Although the document contained a section in which decedent could have added to these enumerated powers (e.g., by giving decedent's daughter the "power to make gifts"), decedent stated in that section that there were "No additions".  Decedent signed a second Illinois power of attorney on May 26, 1993, naming her daughter as her attorney-in-fact for health care decisions.  That document also was effective May 26, 1993.

On April 26, 1994, decedent signed two more Illinois powers of attorney that named her daughter as decedent's attorney-in-fact for health care and property decisions.  The April 26, 1994, power of attorney for health care decisions became effective April 26, 1994.  The April 26, 1994, power of attorney for property decisions became effective upon decedent's "incapacity", defined in that document as a "(a) court determination of my [decedent's] disability because of my inability to manage my

---

[3] Feldman prepared this document but did not deal directly with decedent in doing so.

estate or financial matters, or (b) certification in writing to my agent by a physician familiar with my physical and mental condition that I am unable to transact ordinary business". Feldman prepared these April 26, 1994, powers of attorney because he had concluded that the earlier power of attorney for property decisions did not allow decedent's daughter to give away any of decedent's property. The April 26, 1994, power of attorney for property decisions stated specifically in the section referenced above that allowed additions to the enumerated powers that decedent's daughter, as decedent's attorney-in-fact with respect to decedent's property, could make gifts of decedent's property. When Feldman prepared the powers of attorney in 1993 and 1994, he did not ascertain whether decedent was competent to effect those documents.

6. Decedent's Medical History

On or about July 21, 1994, decedent's daughter brought decedent to a neurologist in Illinois, reporting that decedent had been experiencing medical impairment for approximately 4 years. The specialist examined decedent and diagnosed her as suffering from a clear case of dementia, with impairments in language, memory, concentration, reasoning, insight, and judgment. The specialist advised decedent's regular doctor that decedent required close supervision 24 hours a day. In February 1994, decedent had retained a caretaker to assist her 24 hours a

day.  In 1994, decedent also was experiencing noticeable signs of Alzheimer's disease.

On or about July 25, 1994, decedent's children executed a document stating that they had concluded that "by reason of illness or mental or physical disability, LILLIE ROSEN is unable to give prompt and intelligent consideration to financial matters, and is unable to manage her affairs".  The document referenced the language in the trust document that allowed decedent's children to become successor cotrustees in such a situation and stated that they were accepting the roles as such.

Decedent and decedent's daughter jointly owned a condominium in Miami Beach, Florida.  Decedent lived both there and in Chicago, Illinois, until 1998, when she became too ill to travel to Florida.  At that time, decedent moved permanently to an apartment that she leased in Illinois so her daughter could assist her when her 24-hour caretaker was unavailable.  Decedent remained in that apartment until November 1998 when she was admitted to the hospital on account of a major stroke that left her paralyzed and suffering from aphasia.  Upon her release from the hospital, she moved to a nursing home, where she lived, except for periodic stays in the hospital, until July 1, 2000.  For 1 year after the stroke, her health insurance paid her room and board at the nursing home, but it did not pay for her

doctor's bills or medication.  On July 1, 2000, decedent moved to a hospice, where she remained until she died.

7.  Formation of the LRFLP

In 1994, decedent's son-in-law attended a seminar on family limited partnerships and concluded from this seminar that decedent's assets should be transferred to a family limited partnership in order to reduce the value of her estate for Federal estate tax purposes.[4]  Decedent's son-in-law contacted Feldman, who had been the estate planning attorney for decedent's daughter and decedent's son-in-law since approximately 1980, and discussed with him the idea of transferring decedent's assets to a family limited partnership.  Feldman informed decedent's son-in-law (and later decedent's daughter) that simply changing the form in which decedent's assets were held from a trust to a limited partnership would generate significant tax savings.  Feldman believed that such tax savings were a major and significant reason to form a limited partnership into which decedent's assets would be transferred.

Feldman ultimately structured and formed the LRFLP.  Before doing so, Feldman discussed the matter several times with decedent's son-in-law; neither of decedent's children

---

[4] For approximately 15 years before this seminar, decedent's son-in-law had been attending other seminars sponsored by the entity that sponsored the referenced 1994 seminar.  Those prior seminars always discussed estate planning or Federal estate tax.

participated in these discussions.  On the basis of his general understanding of family limited partnerships in the setting of the Federal estate and gift taxes and his conversations with decedent's son-in-law, Feldman determined who would be the initial general and limited partners of the LRFLP, the amount that each initial partner would contribute, and which assets decedent would and would not contribute to the LRFLP.[5]  Feldman took the view that he represented each initial partner in the formation of the LRFLP but, in reality, he had spoken only to decedent's son-in-law until it came time for the documents to be signed (at which time Feldman also spoke to decedent's daughter, whose role in forming the LRFLP was limited to signing the documents prepared by Feldman as to that formation).  Feldman never met with or spoke to decedent or decedent's son to discuss the formation of the LRFLP.  Many years earlier, Feldman had met with decedent to discuss her view on estate planning, a view that did not include the formation of a limited partnership into which she would transfer her assets.  At the relevant time underlying the formation of the LRFLP, Feldman did not know whether decedent was competent, but he did know that her health was not good.  As

---

[5] As discussed below, decedent and her children were the initial partners of the LRFLP.  Feldman ascertained the dollar amount that each of decedent's children would contribute to the LRFLP by setting the dollar amount of decedent's contribution and then backing into the proportionate dollar amount that would correspond to each child's partnership interest.

of July 31, 1996, the date that the LRFLP was established, decedent was suffering from "full-blown Alzheimer's", and decedent's daughter knew as much.  Also as of that date, Feldman had never spoken to decedent's daughter or decedent's son-in-law about decedent's health or about her potential for tort or other personal liability.

On July 31, 1996, decedent's children signed a partnership agreement for the LRFLP (LRFLP agreement).  Decedent's daughter signed the LRFLP agreement in Illinois in the presence of Feldman, who notarized her signature.  She signed once as a general partner of the LRFLP in her capacity as trustee of the Ilene Field Trust and a second time as the limited partner of the LRFLP in her capacity as cotrustee of the Lillie Investment Trust.  Decedent's son signed the LRFLP agreement in Florida, outside Feldman's presence.  Decedent's son signed the LRFLP agreement individually as a general partner of the LRFLP and a second time as the limited partner of the LRFLP in his capacity as cotrustee of the Lillie Investment Trust.  When decedent's son signed the LRFLP agreement, he had never met or spoken with Feldman.  Upon signing the LRFLP agreement, decedent's children (and Feldman) were unaware of the dollar amount of any partner's contribution to the capital of the LRFLP.  On either October 11 or 14, 1996, Feldman calculated all of those amounts and attached that calculation to the LRFLP agreement as "Exhibit A".  On the

same day, Feldman informed decedent's daughter of the amount that each partner was to contribute to the capital of the LRFLP.

Under the LRFLP agreement, each of decedent's children (decedent's daughter acting as trustee of the Ilene Field Trust) was named a general partner of the LRFLP, with a .5-percent interest. The Lillie Investment Trust was named the sole limited partner, with a 99-percent interest. According to the LRFLP agreement, the LRFLP was to terminate on December 31, 2016, but it could terminate (1) earlier with the consent of all partners or (2) later with the consent of all general partners plus the limited partners holding a majority in interest of the partnership percentages as of a certain date. The LRFLP agreement stated that the principal place of business of the LRFLP was the residence of decedent's son and that the purpose of the LRFLP

> shall be the business of making, protecting, enhancing, and otherwise dealing with purchasing, trading, acquiring, disposing or otherwise investing, on margin or otherwise, domestically or otherwise, in any type of security, whether common stock, preferred stock, debt securities and rights, options and warrants thereto, or otherwise, and all other activities incidental thereto, (b) lending, advancing, arranging, or providing financing to, or entering into joint ventures with, individuals, partnerships, corporations, or other Persons, and all other activities incidental thereto, and (c) any other purpose allowed by applicable law; provided, however, that nothing in this Agreement shall allow the Partnership to make any investments, or do any other things, which shall not be permitted by the Act [defined in the LRFLP agreement as "the Revised Uniform Limited Partnership Act of the State of Florida

as amended from time to time (or any other corresponding provisions of succeeding law)[6]].

The LRFLP agreement stated as to each partner's initial contribution that

> Simultaneously with the execution hereof, each of the partners shall contribute property to the capital of the Partnership, the value of which is set forth opposite such Partner's name in Exhibit A attached hereto (the "Initial Contribution").  The Partners, in exchange for their Initial Contributions to the capital of the Partnership, shall receive the Partnership Percentage set forth opposite their names in Exhibit A.[7]

The LRFLP agreement stated that "decisions concerning the management and control of the business affairs of the Partnership and the investment of the property of the Partnership shall be made solely by the General Partners" and that the general partners of the LRFLP generally have the "sole discretion" to make and time the distribution of funds from the LRFLP.  The LRFLP agreement required that

> At all times during the continuance of the Partnership, proper and true books of account on the cash receipts and disbursements basis shall be kept in accordance with generally accepted accounting principles wherein shall be entered particulars of all monies, goods, or

---

[6] This part of the LRFLP agreement did not contain a section (a).

[7] As stated above, exhibit A was not attached to the LRFLP agreement when it was signed by decedent's children.  Exhibit A stated that decedent's son and the Ilene Field Trust would each contribute $12,145.36 to the LRFLP in exchange for a .5-percent general partnership interest and that the Lillie Investment Trust would contribute $2,404,781.55 in exchange for a 99-percent limited partnership interest.

> effects belonging to or owing to or by the Partnership, or paid, received, sold, or purchased in the course of the Partnership's business, and all of such other transactions, matters, and things relating to the said business of the Partnership as are usually entered in books of account kept by persons engaged in a business of like kind and character. Such books of account shall be kept at the principal office of the Partnership, and each Partner and the accountants, attorneys, and other designated agents of each Partner shall at all reasonable times have free access to and the right to inspect the same.

The LRFLP agreement stated that a partner in the LRFLP needed the prior written consent of the general partners to transfer his or her interest in the LRFLP unless the transfer was to (or in trust for) one of decedent's descendants, or to a charitable organization. None of the partners negotiated any of the relevant terms of the LRFLP agreement; those terms were set by Feldman without consulting any of the partners.

On August 5, 1996, a certificate of limited partnership for the LRFLP was filed with the State of Florida.

On October 11, 1996, decedent's daughter, acting as attorney-in-fact for decedent and as co-trustee of the Lillie Investment Trust, caused $2,404,781 in cash and marketable securities to be transferred from the Lillie Investment Trust to the LRFLP as consideration for the Lillie Investment Trust's 99-percent limited partnership interest. Those funds had been held at Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), in the Lillie Investment Trust's account No. 695-18X99 (Merrill Lynch trust account). On September 12, 1996, decedent's

children, acting as cotrustees of the Lillie Investment Trust, had written Merrill Lynch to instruct it to transfer the funds from the Merrill Lynch trust account to a new account that the letter directed Merrill Lynch to open in the name of the LRFLP. On October 1, 1996, Merrill Lynch opened account No. 69F-07047 (Merrill Lynch LRFLP account) in the name of the LRFLP. Following the transfer of the assets from the Merrill Lynch trust account to the Merrill Lynch LRFLP account, the Merrill Lynch trust account was closed. After the transfer, there was no material change in the manner in which the transferred assets were managed.

Also on October 11, 1996, before the general partners of the LRFLP had contributed any funds to the LRFLP, decedent's daughter, acting as decedent's attorney-in-fact, gave each of decedent's children a 16.4672-percent limited partnership interest in the LRFLP. On October 24 and 30, 1996, decedent's children contributed $12,145 apiece, a total of $24,290, to the capital of the LRFLP as consideration for their initial .5-percent general partnership interests.[8] The $24,290

---

[8] Decedent (through her daughter as decedent's attorney-in-fact) gave her son a $10,000 cash gift approximately 2 months later. As mentioned earlier, decedent (through her daughter as decedent's attorney-in-fact) also gave the other cash gifts on Dec. 31, 1995, and Jan. 1, 1996, to her children and their respective spouses.

represented (with rounding) 1 percent of the total assets of the LRFLP at that time.

8. Operation of the LRFLP

The LRFLP conducted no business activity and had no business purpose for its existence. On its 1996 through 2000 Forms 1065, U.S. Partnership Return of Income, the LRFLP reported no trade or business income and claimed total deductions (and ordinary losses) of $2,526, $2,546, $2,546, $10,504, and $13,771, respectively. The specific items and amounts claimed as expenses were:

|                     | 1996    | 1997    | 1998    | 1999    | 2000    |
|---------------------|---------|---------|---------|---------|---------|
| Florida taxes       | $1,889  | -0-     | -0-     | $3,890  | $3,332  |
| Amortization        | 637     | $2,546  | $2,546  | 2,546   | -0-     |
| Professional fees[1]| -0-     | -0-     | -0-     | 4,068   | 10,439  |
|                     | 2,526   | 2,546   | 2,546   | 10,504  | 13,771  |

[1] The "professionals" to whom these fees were paid appear to be Feldman and the accountant who prepared these Forms 1065. The record does not reflect who paid the accountant to prepare the 1996, 1997, and 1998 Forms 1065.

The LRFLP also reported on its Forms 1065 the following income from other than a trade or business:

|                        | 1996    | 1997    | 1998    | 1999     | 2000    |
|------------------------|---------|---------|---------|----------|---------|
| Portfolio interest     | $295    | $2,062  | $4,613  | $5,335   | 19,198  |
| Dividend income        | 5,274   | 34,257  | 39,793  | 43,348   | 74,499  |
| Capital gain (loss)    | 968     | 2,505   | 7,220   | (27,912) | 20,078  |
| Tax-exempt interest    | 18,437  | 103,249 | 85,641  | 75,887   | 70,931  |
| Other tax-exempt income| -0-     | 219     | -0-     | -0-      | -0-     |

In preparing the Forms 1065, the LRFLP's accountant relied primarily upon Forms 1099 issued by the banks and brokerage

houses and canceled checks that decedent's daughter gave him.
The accountant obtained all other information by talking to
decedent's daughter and to decedent's son-in-law.  The accountant
forwarded the completed returns to decedent's daughter, who
signed them on behalf of the LRFLP.  No books were maintained as
to any activity of the LRFLP, and the primary records that were
kept by or for the LRFLP were the Merrill Lynch account records,
the checkbook (and related canceled checks), and the bank and
brokerage statements for the accounts bearing the name of the
LRFLP.[9]  No formal or documented meetings were held between the
general partners of the LRFLP.

The following table is a summary of the assets held in the
Merrill Lynch LRFLP account on five dates:

|  | 11/29/96 | 12/31/97 | 12/31/98 | 12/31/99 | 06/30/00 |
|---|---|---|---|---|---|
| Equities | $392,234 | $670,234 | 1,056,556 | 1,096,826 | 1,185,247 |
| Mutual funds | 13,514 | 47,156 | 75,886 | 78,604 | 118,014 |
| Securities | 92,877 | 124,785 | 519,546 | 477,077 | 39,724 |
| Municipal bonds | 1,673,052 | 1,489,675 | 1,317,579 | 1,184,717 | 1,146,119 |
| Corporate bonds | -0- | -0- | 100,299 | 126,245 | 187,370 |
| CD's, notes | 20,049 | -0- | -0- | 9,852 | 10,197 |
| Cash | -0- | 626 | 3,384 | 69,676 | 510,335 |
| Total | 2,191,726 | 2,331,850 | 3,073,250 | 3,042,997 | 3,197,006 |

Although the amounts invested in equity versus debt changed
somewhat from year to year, the investment strategy of the
general partners of the LRFLP followed that of decedent when she
had managed her investments.  In addition to this account,
decedent's daughter also maintained at First National Bank of

---

[9] Decedent's children each received copies of the referenced
statements.

Chicago, a.k.a. Bank One (FNBC) checking account No. 1115000772130 (FNBC LRFLP checking account) in the name of the LRFLP.[10]

On the date of decedent's death, the assets of the LRFLP totaled $3,288,192 and consisted of the following:

| | |
|---|---:|
| Money market funds | $553,039 |
| Stocks | 1,169,676 |
| Mutual funds | 90,514 |
| Defined asset fund | 41,344 |
| Certificate of deposit | 10,219 |
| Corporate bonds | 102,165 |
| Government bonds | 9,256 |
| Government bonds | 78,162 |
| Municipal bonds-GO insured | 21,557 |
| Municipal bonds-GO uninsured | 91,717 |
| Municipal bonds-revenue | 1,010,706 |
| Other bonds | 19,050 |
| Preferred stocks | 78,064 |
| Other corporate bonds | 9,706 |
| Other money market account | 3,017 |
| Total | 3,288,192 |

9.  <u>Payment of Decedent's Living Expenses and Satisfaction of Her Gift-Giving Obligations Following the Transfer of Her Assets to the LRFLP</u>

After the transfer of some of her assets to the LRFLP, decedent retained the followed assets:

| <u>Asset</u> | <u>Amount</u> |
|---|---:|
| 50-percent interest in the condominium in Miami Beach, Florida | $50,000 |
| American National Bank savings account No. 32256515 | 917 |
| FNBC joint checking account | 17,731 |
| FNBC money market account No. 10552915 | 6,647 |
| FNBC certificate of deposit | 27,313 |

---

[10] Decedent's daughter and decedent also had joint checking account No. 2952106 at FNBC (FNBC joint checking account).

| | |
|---|---|
| Annuity (approximate value) | 1,600/yr. |
| Social Security benefits (approximate value) | 1,459/mo. |
| Jewelry, furniture, and other personal property (approximate value) | 11,000 |

Following the transfer of decedent's assets to the LRFLP, her retained assets were insufficient to pay her living expenses and the cost of her formal gift-giving program. When the LRFLP was formed, 8 of her then 17 descendants depended on an annual cash gift from decedent of at least $10,000, and those 8 individuals did not want to receive a portion of decedent's limited partnership interest in lieu of cash. Decedent's daughter knew that she would have to withdraw money from the LRFLP to give (on behalf of decedent) $80,000 to those family members in 1997. Decedent's daughter also knew that she would have to withdraw more money to pay some of decedent's living expenses. Decedent's daughter called Feldman in December 1996 and told him that she had to withdraw $80,000 from the LRFLP in that month to make gifts in January 1997 and that she would have to withdraw more funds in later years to pay decedent's living expenses for those later years. Feldman told decedent's daughter to consider any withdrawal from the LRFLP to be a loan to decedent from the LRFLP. Decedent's daughter did not discuss with decedent's son the making of any such loans by the LRFLP, and decedent's son was never involved in treating any amounts withdrawn from the LRFLP as loans to decedent. Decedent's

children, as the general partners of the LRFLP, never discussed how decedent would pay these amounts back.

From 1996 through 2000, after decedent's Social Security benefits had been spent paying some of her living expenses, decedent's daughter withdrew funds from the LRFLP to pay decedent's remaining living expenses and to satisfy decedent's obligations under her gift-giving plan. Those withdrawals came from the Merrill Lynch LRFLP account and the FNBC LRFLP checking account as follows:[11]

> 1996: $80,000 was taken from the Merrill Lynch LRFLP account to make the previously discussed $10,000 gifts in 1997.

> 1997: $20,000 from the Merrill Lynch LRFLP account was used to pay decedent's living expenses.

> 1998: $20,000 from the FNBC LRFLP checking account was used to make $10,000 gifts to Andra Kossy and David Kossy; $14,000 from the FNBC LRFLP account was used to pay decedent's living expenses; $31,000 from the Merrill Lynch LRFLP account was used to pay decedent's living expenses.

> 1999: $55,000 from the Merrill Lynch LRFLP account was used to make gifts (some in 1999, some in 2000) of $15,000 to Benita Silver Levin, $20,000 to Andra Kossy, and $20,000 to David Kossy; $15,100 from the Merrill Lynch LRFLP account was used to pay decedent's living expenses.

---

[11] In addition to the withdrawals listed below, on Dec. 23, 1998, decedent's daughter transferred $516,000 from the Merrill Lynch LRFLP account to the FNBC LRFLP checking account and then transferred that money back to the former account on Jan. 4, 1999. Decedent's daughter made this transfer and retransfer to avoid paying the Florida intangible tax.

2000: $23,744 from the Merrill Lynch LRFLP account was used to pay decedent's living expenses.

With one exception, decedent's daughter considered all of these withdrawals to be loans from the LRFLP to decedent.[12]  As relevant herein, none of the other partners of the LRFLP ever received from the LRFLP a loan, a distribution, or a payment of a personal obligation.

10.  Demand Notes

Two demand notes were prepared in connection with the use of the funds of the LRFLP to benefit decedent.  The first note (note 1) was dated December 30, 1996, and was in the stated amount of $80,000.  This amount reflected the withdrawal used to finance the previously discussed gifts in 1997.

Under the terms of note 1, decedent (through her daughter as decedent's attorney-in-fact) agreed to pay the LRFLP $80,000 plus interest at the "blended annual rate for the year as published annually by the Commissioner".  Note 1 contained no maturity date but was payable on demand.  Note 1 stated that the LRFLP could transfer additional funds for the benefit of decedent and that the terms of any additional transfer would be the same as those expressed in note 1.  Neither Feldman nor the LRFLP kept

_____

[12] The single exception concerned a $16,000 withdrawal in November 1998.  For some unexplained reason, decedent's daughter considered only $5,745 of this amount to be a loan.  Thus, while we add the withdrawals to equal $258,844, petitioners assert that the lent funds total $248,589 ($258,844 – ($16,000 – $5,745) = $248,589).

contemporaneous records of the amounts of the LRFLP's funds that were expended for decedent's benefit.

After decedent died, decedent's children signed a second note (note 2).  In note 2, decedent's children (as cotrustees of the Lillie Investment Trust) agreed to assume decedent's purported liability under note 1 in the amount of $292,077 (purportedly representing $258,589 in principal[13] plus $33,488 in interest accrued to decedent's death) and to pay that amount to the LRFLP with interest at the "blended annual rate for the year as published annually by the Commissioner".  Note 2 was dated July 14, 2000 (the date of decedent's death), but was not prepared until after that date.  Note 2 contained no maturity date but was payable on demand.  Note 2 stated that the LRFLP could transfer additional funds for the benefit of the Lillie Investment Trust and that the terms of any additional transfer would be the same as those expressed in note 2.

None of the funds reflected in either note 1 or note 2 were transferred for the benefit of decedent with any expectation of repayment from decedent or with any intent to enforce the terms of either note against decedent.  Neither general partner of the LRFLP ever demanded from decedent any repayment of either note, and the general partners were not concerned about receiving

---

[13] Petitioners assert that note 2 incorrectly reflects that $258,589 of principal was owing, rather than the $248,589 discussed supra n.12.

before decedent's death the repayment of any of the funds reflected in either note.  Nor was there any stated security or collateral for any repayment of the funds reflected in either note.

During her life, decedent never repaid any of the principal or interest reflected in note 1 or note 2.  Nor did decedent have the ability to repay those amounts unless she sold (or the LRFLP redeemed) her interest in the LRFLP for a price greater than those amounts.  As discussed below, decedent's limited partnership interest in the LRFLP was redeemed after she died, and her estate paid all of the amounts shown as due in the notes (inclusive of principal and interest) through a reduction of the proceeds that the estate received in the redemption.

11.  Gifts of the LRFLP Interests

Between October 11, 1996, and January 7, 2000, decedent's daughter (as decedent's attorney-in-fact) gave decedent's descendants a total of 64.0012 percent of the limited partnership interest in the LRFLP.  The specifics of these gifts were as follows:[14]

_____

[14] As of Oct. 11, 1996, the number of decedent's descendants had increased to 19 on account of the births of Zachary Silver and Julia Anne Levens and the apparent marriage of Daniel and Dana Silver.  In each of the years from 1997 through 2000, decedent's daughter (as decedent's attorney-in-fact) gave cash or a limited partnership interest in the LRFLP to 18 of the 19 descendants.  Dana Silver received a gift ($10,000 cash) only in 1997.  The record does not indicate whether Dana Silver remained

(continued...)

| Date | Donee | Relationship | LRFLP Interest |
|------|-------|--------------|----------------|
| 10/11/96 | Decedent's son | Son | 16.4672% |
| 10/11/96 | Decedent's daughter | Daughter | 16.4672 |
| 10/11/96 | Zachary Silver | Great-grandson | .5881 |
| 10/11/96 | Julia Anne Levens | Great-granddaughter | .5881 |
| 1/8/97 | Decedent's daughter | Daughter | .5748 |
| 1/8/97 | Decedent's son-in-law | Son-in-law | .5748 |
| 1/8/97 | Debra Levens | Granddaughter | .5748 |
| 1/8/97 | Benita Silver Levin | Granddaughter | .5748 |
| 1/8/97 | Marcus Levin | Great-grandson | .5748 |
| 1/8/97 | Zachary Silver | Great-grandson | .5748 |
| 1/8/97 | Rachael Kossy | Great-granddaughter | .5748 |
| 1/8/97 | Julia Anne Levens | Great-granddaughter | .5748 |
| 1/8/97 | Nicole Levens | Great-granddaughter | .5748 |
| 1/7/98 | Decedent's son | Son | 1.1269 |
| 1/7/98 | Decedent's daughter | Daughter | 1.1269 |
| 1/7/98 | Decedent's son-in-law | Son-in-law | .5009 |
| 1/7/98 | Decedent's daughter-in-law | Daughter-in-law | .5009 |
| 1/7/98 | Alan Silver | Grandson | .5009 |
| 1/7/98 | Daniel Silver | Grandson | .5009 |
| 1/7/98 | Debra Levens | Granddaughter | .5009 |
| 1/7/98 | Benita Silver Levin | Granddaughter | .5009 |
| 1/7/98 | Marcus Levin | Great-grandson | .5009 |
| 1/7/98 | Benjamin Silver | Great-grandson | .5009 |
| 1/7/98 | Jacob Silver | Great-grandson | .5009 |
| 1/7/98 | Zachary Silver | Great-grandson | .5009 |
| 1/7/98 | Rachael Kossy | Great-granddaughter | .5009 |
| 1/7/98 | Julia Anne Levens | Great-granddaughter | .5009 |
| 1/7/98 | Nicole Levens | Great-granddaughter | .5009 |
| 1/7/98 | Gary Levens | Grandson-in-law | .5009 |
| 1/5/99 | Decedent's son | Son | .9727 |
| 1/5/99 | Decedent's daughter | Daughter | .9727 |
| 1/5/99 | Decedent's son-in-law | Son-in-law | .4323 |
| 1/5/99 | Decedent's daughter-in-law | Daughter-in-law | .4323 |
| 1/5/99 | Alan Silver | Grandson | .4323 |
| 1/5/99 | Daniel Silver | Grandson | .4323 |
| 1/5/99 | Debra Levens | Granddaughter | .4323 |
| 1/5/99 | Marcus Levin | Great-grandson | .4323 |
| 1/5/99 | Benjamin Silver | Great-grandson | .4323 |
| 1/5/99 | Jacob Silver | Great-grandson | .4323 |
| 1/5/99 | Zachary Silver | Great-grandson | .4323 |
| 1/5/99 | Rachael Kossy | Great-granddaughter | .4323 |
| 1/5/99 | Julia Anne Levens | Great-granddaughter | .4323 |
| 1/5/99 | Nicole Levens | Great-granddaughter | .4323 |
| 1/5/99 | Gary Levens | Grandson-in-law | .4323 |
| 1/7/00 | Decedent's son | Son | .9857 |
| 1/7/00 | Decedent's daughter | Daughter | .9857 |
| 1/7/00 | Decedent's son-in-law | Son-in-law | .4381 |
| 1/7/00 | Decedent's daughter-in-law | Daughter-in-law | .4381 |
| 1/7/00 | Alan Silver | Grandson | .4381 |
| 1/7/00 | Daniel Silver | Grandson | .4381 |
| 1/7/00 | Debra Levens | Granddaughter | .4381 |
| 1/7/00 | Benita Silver Levin | Granddaughter | .2190 |

---

[14](...continued)
a descendant of decedent after 1997.

| 1/7/00 | Gary Levens | Grandson-in-law | .4381 |
|--------|-------------|-----------------|-------|
| 1/7/00 | Marcus Levin | Great-grandson | .4381 |
| 1/7/00 | Benjamin Silver | Great-grandson | .4381 |
| 1/7/00 | Jacob Silver | Great-grandson | .4381 |
| 1/7/00 | Zachary Silver | Great-grandson | .4381 |
| 1/7/00 | Rachael Kossy | Great-granddaughter | .4381 |
| 1/7/00 | Julia Anne Levens | Great-granddaughter | .4381 |
| 1/7/00 | Nicole Levens | Great-granddaughter | .4381 |

12. <u>Post-Death Events</u>

When decedent died, the Lillie Investment Trust held a 34.9988-percent limited partnership interest in the LRFLP. The following is a summary of the percentage ownership of the LRFLP held by decedent and her descendants at that time:

| <u>Interest Holder</u> | <u>Percentage</u> |
|-------------------------|-------------------|
| General partners: | |
| Ilene Field Trust | .5% |
| Decedent's son | .5 |
| Limited partners: | |
| Lillie Investment Trust | 34.9988 |
| Decedent's son | 19.5525 |
| Ilene Field Trust | 20.1273 |
| Gerson B. Field Trust | 1.9461 |
| Decedent's daughter-in-law | 1.3713 |
| Andra Kossy as custodian for Rachael Kossy | 1.9461 |
| Debra Levens | 1.9461 |
| Debra Levens as custodian for Julia Anne Levens | 2.5342 |
| Debra Levens as custodian for Nicole Levens | 1.9461 |
| Benita Silver Levin | 1.2947 |
| Benita Silver Levin as custodian for Marcus Levin | 1.9461 |
| Daniel Silver | 1.3713 |
| Alan Silver | 1.3713 |
| Daniel Silver as custodian for Benjamin Silver | 1.3713 |
| Daniel Silver as custodian for Jacob Silver | 1.3713 |
| Daniel Silver as custodian for Zachary Silver | 2.5342 |
| Gary Levens | 1.3713 |
| Total | 100.0000 |

After decedent died, the LRFLP redeemed the Lillie Investment Trust's limited partnership interest. Before the redemption but after decedent's death, $97,412 was paid from the Merrill Lynch LRFLPA account to the benefit of decedent for the period immediately preceding her death, or her estate. Of that amount, $5,712 was used to pay decedent's living expenses; $7,700 was used to pay decedent's funeral expenses; and $14,000 was used to pay decedent's (or her estate's) legal fees. The remaining $70,000 was used to make $10,000 bequests to decedent's son, Alan Silver, Daniel Silver, Benita Silver Levin, Debbie Levens, Andra Field, and a charitable organization. No note was prepared to reflect any of these payments. On February 21, 2001, $2,230 from the FNBC joint checking account was used to pay the Florida intangible tax.

On February 1, 2001, the LRFLP and the Lillie Investment Trust entered into the agreement for the redemption of the Lillie Investment Trust's limited partnership interest. In the agreement, the LRFLP agreed to redeem the Lillie Investment Trust's limited partnership interest for $743,263. On March 7, 2001, the LRFLP paid decedent's estate $341,977 of the redemption price and retained the $401,286 balance in payment of the

"loans".[15]  The balance paid to the Lillie Investment Trust was
computed as follows:

| | | |
|---|---|---:|
| Redemption amount | | $743,263 |
| | | |
| Loans before death | $258,589 | |
| Loans after death | 97,412 | |
| Interest accrued to date of death | 33,488 | |
| Interest accrued after date of death | <u>11,797</u> | <u>401,286</u> |
| Net proceeds to decedent's estate | | 341,977 |

At or about the same time, decedent's daughter, as cotrustee
of the Lillie Investment Trust, opened Merrill Lynch account No.
695-33K24 (Merrill Lynch postdeath trust account) in the name of
the Lillie Investment Trust.  The account was funded on March 7,
2001, with the just-referenced $341,977.  In 2001 and 2002, funds
were paid to the benefit of decedent (or her estate) from the
Merrill Lynch postdeath trust account.  As to these funds,
$4,032.14 was paid to appraise the LRFLP; $12,832.32 was paid for
attorney's fees; $6,704 was paid for the Florida death tax;
$152,227.81 was paid for the Federal estate tax; $25 was paid for
postage; $1,175.81 was paid for decedent's funeral; $2,400 was
paid for an accounting fee related to the Florida intangible tax;
$1,956.80 was paid for the Florida intangible tax; and $7,651 was
paid for the Lillie Investment Trust's 2001 Form 1041, U.S.
Income Tax Return for Estates and Trusts.  In addition, on
November 7, 2005, decedent's daughter wrote a check in the amount

---

[15] We use the term "loan" in quotation marks for simplicity
and do not intend to suggest that the underlying amounts were in
fact loans for Federal tax purposes.

of $1,133,000 with respect to the tax deficiencies at issue.  The
money that was used to fund that check was distributed from the
LRFLP.

13.  Pretrial Order of August 5, 2004

On August 5, 2004, the Court issued the following pretrial
order in docket No. 7575-04:

>    For cause, it is
>
>    ORDERED that each of the parties shall file no
> later than September 7, 2004, a memorandum [issues
> memorandum] setting forth–
>
>    (1)(a) The issues of fact (including any
>    issues subsidiary to ultimate issues), and
>    (b) the issues of law (including any issues
>    subsidiary to ultimate issues) to be resolved
>    by the Court.  Such issues should be set
>    forth in sufficient detail to enable the
>    Court to decide the case in its entirety by
>    addressing each of the issues listed.
>
>    (2) A clear, complete, and concise
>    exposition of each party's position and the
>    theory underlying that position with respect
>    to each of the issues that are set forth
>    pursuant to (1) above.  In this regard, each
>    party shall include a statement in narrative
>    form of what each party expects to prove.
>
>    *    *    *    *    *    *    *
>
> It is further
>
>    ORDERED that the statement of issues set forth
> pursuant to (1) above shall control the admissibility
> of evidence at trial * * *.  It is further
>
>    ORDERED that neither party will be allowed to
> advance a position or theory underlying that position
> with respect to * * * one or more of the issues set
> forth pursuant to (1) above that is different from the
> positions or theories set forth pursuant to (2) above.

Respondent filed his issues memorandum on December 6, 2004.

Eight days later, petitioner in docket No. 7575-04 filed an

issues memorandum that stated:

> The reason that the decedent and her children formed
> the Lillie Rosen Family Limited Partnership was to have
> a family business of making, protecting, enhancing, and
> investing in the partnership's assets.  This included
> trading, acquiring, disposing or investing in
> securities on behalf of the partnership's partners.

OPINION[16]

1.  Preface

Respondent determined that the assets of decedent

transferred to the LRFLP are includable in her gross estate under

section 2036(a)(1).  According to respondent, those assets were

transferred in other than a bona fide sale for full and adequate

consideration, and decedent retained until her death the

possession or enjoyment of, or the right to the income from, the

_____

[16] During the trial of these cases, petitioners elicited
testimony from witnesses who included decedent's children,
decedent's son-in-law, and Feldman.  Each named witness has a
pecuniary interest in the outcome of these cases.  Our perception
of Feldman and decedent's son-in-law while viewing them
testifying at trial, coupled with our review of the record, leads
us to discount much of their testimony as unreliable.  Our
perception of decedent's children while viewing them testifying
at trial, coupled with our review of the record, leads us to
discount the portion of their testimony that is inconsistent with
objective evidence in the record.  We do not rely on the
discounted testimony to support petitioners' positions herein.
See Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991),
affg. T.C. Memo. 1989-103 as amended by T.C. Memo. 1989-393;
Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84
(2000), affd. 299 F.3d 221 (3d Cir. 2002); cf. United States v.
Thompson, 422 F.3d 1285 (11th Cir. 2005).

assets.  Petitioners argue that section 2036(a)(1) does not apply because the assets were transferred in a bona fide sale for full and adequate consideration.  Alternatively, petitioners argue, section 2036(a)(1) does not apply because decedent did not retain the possession or enjoyment of, or the right to income from, the transferred assets.  As a second alternative, petitioners argue, section 2036(a)(1) does not apply to all of the transferred assets because decedent gave away a 48.5502-percent limited partnership interest in the LRFLP more than 3 years before she died.[17]  Petitioners assert that only those assets that decedent actually owned at her death are included in her gross estate.

2.  Overview of Section 2036(a)(1)

Congress has imposed a Federal estate tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States.  See sec. 2001.  Decedent's taxable estate equals her gross estate less applicable deductions.  See sec. 2051.  Decedent's gross estate includes the fair market value of all property to the extent provided in sections 2031 through 2046.  See sec. 2031.  For purposes of this computation, the

---

[17] Petitioners argue that decedent gave away a 48.5502-percent limited partnership interest in the LRFLP more than 3 years before her death.  Petitioners explain that decedent died on July 14, 2000, and that the 48.5502-percent interest corresponds to the total of the limited partnership interests that were the subject of decedent's gifts in 1996, 1997, and 1998.  To state the obvious, decedent's gifts in 1998 were not more than 3 years before her death in 2000.

parties dispute whether section 2036(a)(1) applies to the transferred assets.  In relevant part, section 2036(a)(1) provides:

SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.

(a)  General Rule.  The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to income from, the property * * *

Congress enacted section 2036 intending to bring within a decedent's gross estate "transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime."  United States v. Estate of Grace, 395 U.S. 316, 320 (1969); see also Estate of Strangi v. Commissioner, 417 F.3d 468, 476 (5th Cir. 2005) (citing Estate of Lumpkin v. Commissioner, 474 F.2d 1092, 1097 (5th Cir. 1973), vacating 56 T.C. 815 (1971)), affg. T.C. Memo. 2003-145.  Under section 2036(a)(1), decedent's gross estate will include the fair market value of the transferred assets to the extent that decedent retained possession or enjoyment of the assets for her life or for any other period that does not end before her death.  Section 2036(a) "describes a broad scheme of inclusion in the gross

estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).

In order not to have retained an interest described in section 2036(a)(1), decedent must have "absolutely, unequivocally, irrevocably, and without possible reservations," parted with all of her title, possession, and enjoyment of the transferred assets. Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949). Decedent will have retained an interest in the transferred assets to the extent that the assets were transferred with an understanding or agreement, express or implied, that the possession or enjoyment of, or the right to the income from, the assets would be for decedent's pecuniary benefit. See Guynn v. United States, supra at 1150; Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979); sec. 20.2036-1(a) and (b)(2), Estate Tax Regs.; see also United States v. Byrum, 408 U.S. 125, 145, 150 (1972) (in the context of section 2036(a)(1), the word "enjoyment" denotes the receipt of a "substantial present economic benefit" as opposed to "a speculative and contingent benefit which may or may not be realized"). Such is so even if the retained interest is not legally enforceable. See Estate of Abraham v. Commissioner, 408 F.3d 26, 39 (1st Cir. 2005), affg. T.C. Memo. 2004-39; Estate of Maxwell v. Commissioner, 3 F.3d

591, 593 (2d Cir. 1993), affg. 98 T.C. 594 (1992); Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000).

Whether there was an understanding or agreement for decedent to retain possession or enjoyment of the transferred assets is determined from all of the facts and circumstances surrounding both the transfer itself and the assets' subsequent use. See Estate of Abraham v. Commissioner, supra at 39. We carefully scrutinize the facts and circumstances of this case because it involves an intrafamily transaction. See Slappey Drive Indus. Park v. United States, 561 F.2d 572, 584 n.21 (5th Cir. 1977); Anderson v. Commissioner, 164 F.2d 870, 873 (7th Cir. 1947), affg. 5 T.C. 443 (1945); Estate of Maxwell v. Commissioner, 98 T.C. at 602. While intrafamily transactions are not barred by section 2036(a)(1), we test whether the resulting terms and conditions of the transfer of decedent's assets to the LRFLP were the same as if unrelated parties had engaged in the same transaction. See Estate of Bongard v. Commissioner, 124 T.C. 95, 123 (2005). Petitioners have the burden of proof as their counsel acknowledged at trial.

3.  Bona Fide Sale for Adequate and Full Consideration

Under a plain reading of section 2036(a), decedent's gross estate does not include the value of property transferred in "a bona fide sale for an adequate and full consideration in money or money's worth". Petitioners argue primarily that the transfer of

decedent's assets to the LRFLP was such a sale.  We disagree.  In the context of section 2036(a), a finding of "a bona fide sale for an adequate and full consideration in money or money's worth" requires that "the transfer must have been made in good faith, and the price must have been an adequate and full equivalent reducible to a money value."  Sec. 20.2043-1(a), Estate Tax Regs. As this Court has recently stated, a transfer of assets to a family limited partnership may meet this requirement if the record establishes that:  (1) The family limited partnership was formed for a legitimate and significant nontax reason and (2) each transferor received a partnership interest proportionate to the fair market value of the property transferred.  See Estate of Bongard v. Commissioner, supra at 118; cf. Estate of Strangi v. Commissioner, supra at 479 ("the proper inquiry is whether the transfer in question was objectively likely to serve a substantial non-tax purpose"); Estate of Thompson v. Commissioner, 382 F.3d 367, 379-380 (3d Cir. 2004) (discussing the lack of "legitimate business operations" in concluding that a transfer to a family entity was not a bona fide sale), affg. T.C. Memo. 2002-246.  After analyzing the record at hand in the light of the first prong of this test, we conclude that this test has not been met.  Given this conclusion, we do not consider the second prong.

Petitioners assert as to the first prong that the LRFLP

was formed for four legitimate and significant nontax
purposes, beyond estate tax savings: (1) to protect
the decedent's assets during her lifetime, and,
ultimately, to provide limited liability protection to
the donees of the limited partnership interests; (2) to
create giftable assets that preserve value and cannot
be easily liquidated in the short-term, (3) to
facilitate Decedent's annual gifting program to her
family; and (4) to provide for the common management of
the LRFLP's assets during the decedent's lifetime and
after her death.

The credible evidence at hand does not support this assertion to

the extent that it relates to forming the LRFLP for a reason

other than the avoidance of Federal estate (and gift) tax.[18]  As

an initial matter, petitioner's issues memorandum lists only the

following reason for forming the LRFLP:  "[T]o have a family

business of making, protecting, enhancing, and investing in the

partnership's assets.  This included trading, acquiring,

disposing or investing in securities on behalf of the

partnership's partners."  In order to qualify as a "legitimate

and significant nontax reason" within the meaning of Estate of

Bongard v. Commissioner, supra at 118, we must find that the

reason was an important one that actually motivated the formation

of that partnership from a business point of view.  See id.  The

_____

[18] Petitioners concede on brief that the LRFLP was formed to
reduce the value of decedent's gross estate for Federal estate
tax purposes and to avoid paying Federal estate tax on the amount
of the reduction.

reason must be an actual motivation, not a theoretical justification, for a limited partnership's formation. See id.

On the basis of the credible evidence in the record, we conclude that the transfer of decedent's assets was not "a bona fide sale" within the meaning of section 2036(a)(1). See Estate of Thompson v. Commissioner, supra at 383 (transfer to a family limited partnership is not a bona fide sale if it does not "provide the transferor some potential for benefit other than the potential estate tax advantages that might result from holding assets in the partnership form"). We find that the overwhelming reason for forming the LRFLP was to avoid Federal estate and gift taxes and that neither decedent nor her children had any legitimate and significant nontax reason for that formation. Decedent and her children were not even involved in the structure of the LRFLP. Decedent's son-in-law knew that decedent was wealthy and in the waning years of her life, and he approached Feldman to structure and form the LRFLP to lower the Federal estate and gift tax that would be assessed on her wealth and the passing thereof. The LRFLP was structured and formed to hold decedent's assets and to allow the assets to pass to decedent's descendants with minimal tax. Any other reason that may have been discussed by decedent's son-in-law and Feldman at or after the time of formation was simply a theoretical justification that could be, and was, advanced in the event of a challenge to their

estate planning scheme.  The estate planning nature of the LRFLP is further revealed when we view the specific manner in which the LRFLP was formed.  Feldman established the terms of the LRFLP without talking to any of the partners, and he set each partner's contribution to capital by first valuing decedent's assets and her contribution to capital and then calculating all of the remaining numbers on the basis of his initial calculation.[19]  As he testified:

> I knew how much Lillie Rosen was putting in.  That represented 99 percent, so I used, you know, an algebraic formula to determine what additional 1 percent would consist of.  So basically I took the value of her—-of Lillie Rosen's contribution and divided it by 99 percent, and came up with a total value of the partnership to equal 100 percent.  Then I subtracted Lillie Rosen's contribution to come up with the 1 percent interest, and then I divided that in two. They each put in half of 1 percent.

Notwithstanding the incredible subjective expressions of contrary intent espoused at trial by individuals connected with the LRFLP, the objective facts in the record support our conclusion that the transfer of decedent's assets to the LRFLP was not a bona fide sale.  First, the LRFLP was not engaged in a valid, functioning business operation, and the LRFLP served no legitimate or significant nontax purpose; it operated simply as a

---

[19] While Feldman testified that he consulted with decedent's son and other "family members" before forming the LRFLP, we find that he spoke only to decedent's son-in-law.  Indeed, decedent's son testified that he did not remember ever meeting Feldman and that the only time that he may have spoken to Feldman was after decedent's funeral.

vehicle for changing the form in which decedent held her beneficial interest in the transferred assets.  See Estate of Harper v. Commissioner, T.C. Memo. 2002-121; see also Estate of Bongard v. Commissioner, 124 T.C. at 128-129.  Although the LRFLP did have some minimal economic activity consisting of its receipt of dividend and interest income, its apparent sale of a small portion of its portfolio, and its reinvestment of the proceeds of matured bonds, this passive activity was not significant enough to characterize the LRFLP as a legitimate business operation, see Estate of Thompson v. Commissioner, 382 F.3d at 379, or, as suggested by petitioners, a true joint venture.  Nor did the LRFLP maintain the books of account required by the LRFLP agreement (books that would have been commonplace in a true business venture), comply with all of the other terms of the LRFLP agreement (e.g., no capital contributions were made by any of the partners simultaneously with the signing of the LRFLP agreement), hold formal or documented meetings between the general partners, or operate the way that a bona fide partnership would have operated (e.g., while the LRFLP agreement was signed on July 31, 1996, and a certificate of limited partnership was filed 5 days later, the amount of each partner's contribution to the capital of the LRFLP was not set until October 11, 1996, at the earliest).  See Estate of Bigelow v. Commissioner, T.C. Memo. 2005-65.

Second, the partners of the LRFLP did not negotiate or set any of the terms of the LRFLP, and decedent's daughter (as decedent's attorney-in-fact, cotrustee of the Lillie Investment Trust, and general partner of the LRFLP) stood on all sides of the transaction. See Estate of Strangi v. Commissioner, 417 F.3d 468 (5th Cir. 2005); Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46; Estate of Harper v. Commissioner, supra. Feldman singlehandedly set up everything connected with the LRFLP without first discussing the matter with any of the partners. See Estate of Harper v. Commissioner, supra; Estate of Korby v. Commissioner, T.C. Memo. 2005-103; Estate of Korby v. Commissioner, T.C. Memo. 2005-102. He decided who should be the general and limited partners and how much each partner would contribute to the LRFLP. He represented each initial partner in the formation of the LRFLP, and he chose the limited partnership form solely so that decedent or her estate could claim discounts on the proportionate values of the assets that were reflected in the partnership interests that were either the subject of gifts or included in decedent's gross estate. As decedent's daughter conceded at trial: Feldman "drew up the partnership agreement, and he was the one who told us what to do and how to do it."

Third, while the LRFLP agreement was signed on July 31, 1996, decedent did not make her initial contribution until October 11, 1996, and decedent's children did not make their

initial contributions until October 24 and 30, 1996.[20]  The reported contributions of assets by decedent's children also were de minimis in relation to the assets contributed by decedent; in fact, given the cash gifts that decedent made to each of her children surrounding their contributions to the capital of the LRFLP, decedent arguably funded the LRFLP all by herself, see Estate of Reichardt v. Commissioner, 114 T.C. at 155 (finding the lack of a bona fide sale for adequate and full consideration where, among other things, the decedent's children transferred nothing to the decedent or to the partnership).  We also note that decedent's daughter, acting as decedent's attorney-in-fact, gave both herself and her brother a 16.4672-percent limited partnership interest in the LRFLP before they had even made their initial contributions.

Fourth, decedent, acting through her daughter (her attorney-in-fact and co-trustee of the Lillie Investment Trust) transferred substantially all of decedent's assets, including all of her investment assets, to the LRFLP.  The management of the transferred assets was the same both before and after the transfer, and no meaningful change occurred in decedent's

_____

[20] Petitioners assert that decedent's funds were not transferred upon the signing of the LRFLP agreement because it took time to open the Merrill Lynch LRFLP account and to transfer the funds into that account from the Merrill Lynch trust account. We are unpersuaded.  Decedent's children waited more than 6 weeks after the signing of the LRFLP agreement even to ask Merrill Lynch to open the new account and to make the transfer.

relationship to her assets after the transfer.  See <u>Estate of Schutt v. Commissioner</u>, T.C. Memo. 2005-126; <u>Estate of Korby v. Commissioner</u>, T.C. Memo. 2005-103; <u>Estate of Korby v. Commissioner</u>, T.C. Memo. 2005-102; <u>Estate of Schauerhamer v. Commissioner</u>, T.C. Memo. 1997-242.  We also note that during the first 4 years of the LRFLP's existence, i.e., the last 4 years of decedent's life, decedent's daughter (as decedent's attorney-in-fact) gave away almost 65 percent of decedent's limited partnership interest.

Fifth, after the transfer of the assets to the LRFLP, decedent was unable to meet her financial obligations without using funds of the LRFLP.  In fact, all of the funds that were withdrawn from the LRFLP were used for decedent's benefit.  Before decedent died, that benefit included the payment of her personal living expenses and the carrying out of her intent to make significant annual gifts to each of her descendants.  After decedent died, that benefit included the satisfaction of the bequests set forth in the Lillie Investment Trust, the payment of costs related to administering her estate, and the satisfaction of her Federal estate tax liability.  The use of the LRFLP's funds to satisfy those obligations of decedent is inconsistent with a finding of a bona fide sale.  See <u>Estate of Thompson v. Commissioner</u>, 382 F.3d 367 (3d Cir. 2004); <u>Estate of Korby v. Commissioner</u>, T.C. Memo. 2005-103; <u>Estate of Korby v.</u>

Commissioner, T.C. Memo. 2005-102; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

Sixth, the assets that were contributed to the LRFLP consisted solely of marketable securities and cash. For the most part, the assets of the LRFLP appear not to have been traded by the LRFLP, which, in part, explains the minimal capital gain income and loss reported by the LRFLP. As the Court of Appeals for the Third Circuit has suggested, the mere holding of an untraded portfolio of marketable securities weighs against the finding of a nontax benefit for a transfer of that portfolio to a family entity. See Estate of Thompson v. Commissioner, supra at 380. This Court also has agreed with that principle in cases where, as here, the securities were contributed almost exclusively by one person. See Estate of Strangi v. Commissioner, T.C. Memo. 2003-145; Estate of Harper v. Commissioner, supra.

Seventh, we note decedent's age and health when the LRFLP was formed. In 1994, 2 years before the LRFLP agreement was signed, decedent was suffering from dementia and Alzheimer's disease. As of the beginning of 1994, she also had retained a caretaker to assist her 24 hours a day. The fact that decedent was 88 years old and in failing health strongly supports our finding that the transfer of the assets was purely for the purpose of avoiding Federal estate and gift taxes. Accord Estate

of Korby v. Commissioner, T.C. Memo. 2005-103; Estate of Korby v. Commissioner, T.C. Memo. 2005-102.  Such is especially so where, as here, decedent's daughter (as decedent's attorney-in-fact) transferred substantially all of decedent's assets to the LRFLP and did not retain sufficient assets to support decedent for the rest of her life.  See Estate of Thompson v. Commissioner, supra at 376-377.

Nor does the credible evidence in the record support the purposes that petitioners allege motivated the formation of the LRFLP.  First, as to petitioners' claim that the LRFLP was formed to create centralized management, decedent had centralized management through the Lillie Investment Trust.  The Lillie Investment Trust held almost all of decedent's assets and allowed her (or a successor trustee) to manage and control her assets in full.[21]  In fact, even Feldman admitted that decedent had centralized management through the Lillie Investment Trust. While Feldman also stated that the LRFLP allowed decedent to make gifts of a limited partnership interest without selling any assets, we do not find that decedent, before the transfer, had to sell any of her assets to make the gifts that she then made; e.g., she annually selected the stocks and bonds that were the

---

[21] For example, decedent's daughter, as a successor co-trustee, displayed her control over decedent's assets when she transferred the assets from the Merrill Lynch trust account to the Merrill Lynch LRFLP account.

subject of each prior gift.  Feldman also testified that placing the assets in the LRFLP allowed the general partners to invest with fewer fiduciary restrictions than through the Lillie Investment Trust.  Upon further questioning, however, Feldman conceded that the general partners' investments through the LRFLP were not in fact more liberal than had been made through the Lillie Investment Trust and that the trust document could easily have been rewritten to give the cotrustees powers similar to those set forth in the LRFLP agreement.

Second, as to petitioners' claim that the LRFLP was formed to limit decedent's liability, i.e., to protect her assets from her creditors, petitioners have not persuaded us that the LRFLP was likely to provide more meaningful creditor protection than the Lillie Investment Trust would have provided.  As we understand petitioners' factual position as to this claim, the LRFLP was formed so that someone could not sue decedent and foreclose on her assets for payment of a judgment against her. From a factual point of view, however, the record is devoid of persuasive evidence that the LRFLP was formed with any such intent.  Nor do we find that Feldman informed either of decedent's children, before they signed the LRFLP agreement, that the LRFLP was meant to limit the liability of decedent or any other limited partner.  Indeed, Feldman testified that before the LRFLP was formed, he never discussed with decedent's daughter or

decedent's son-in-law the subject of whether decedent risked incurring personal liability on account of her actions. Feldman also conceded during his testimony that decedent did not drive a car or face any other specific type of liability, except, he stated, possibly from her caretaker. While Feldman stated that decedent, like any other individual, always faced the risk that she could be sued on account of her actions, we are unpersuaded by this statement of mere general applicability that limiting decedent's personal liability was an actual purpose for forming the LRFLP. Instead, we hear that statement as nothing more than a theoretical justification for the formation of a limited partnership. Such is especially so given that, like decedent, the general partners of the LRFLP are elderly individuals who face similar risks of liability. Whereas a limited partnership's assets are typically not protected from the liability of its general partners, it seems that the formation of the LRFLP with two individual general partners effectively increased the possibility that a creditor could foreclose on decedent's transferred assets.[22] Although decedent's daughter testified that

---

[22] Feldman also did not know or investigate whether decedent was already protected against personal liability or whether, in the case of the caretaker, the employment relationship between decedent and her caretaker precluded the latter from suing the former on account of actions that arose in the course of that relationship. Feldman acknowledged that decedent had a "renter's insurance" policy but stated that he did not know the specific terms of that policy.

decedent had the potential to commit a tort, we do not find that she had this concern when the LRFLP was formed.  Nor do we find that tort liability was a motivation for forming the LRFLP or that decedent's daughter had discussed this issue with her husband or her brother.

We also disagree with petitioners' reasoning from a legal point of view.  Petitioners assert that decedent's creditors could not satisfy judgments against her by foreclosing on her interest in the LRFLP but could only attach distributions that the LRFLP actually made to her.  By contrast, petitioners assert, decedent's creditors could satisfy judgments against her by foreclosing on the assets of the Lillie Investment Trust.  Petitioners conclude from these assertions that the LRFLP offered more creditor protection than offered by the Lillie Investment Trust.  We are unpersuaded.  Whereas creditors can set aside fraudulent transfers in both Florida and Illinois, see Fla. Stat. Ann. sec. 726.108 (West 2000); 740 Ill. Comp. Stat. Ann. 160/5(a)(1) (West 2002), we are unpersuaded on the facts at hand that decedent's creditors would not have been able to foreclose on substantially all of decedent's assets transferred to the LRFLP.  See United States v. Engh, 330 F.3d 954 (7th Cir. 2003); Friedman v. Heart Inst. of Port St. Lucie, Inc., 863 So. 2d 189 (Fla. 2003).  Nor are we persuaded that the transfer would withstand scrutiny in a bankruptcy court.  See, e.g., Movitz v.

Fiesta Invs., LLC (In re Ehmann), 319 Bankr. 200 (Bankr. D. Ariz. 2005).

Third, as to petitioners' claim that the LRFLP was formed to facilitate decedent's gift giving and to preserve the value of her gifts, even if gift giving were an actual reason for the LRFLP's formation, it is not a significant nontax purpose that could characterize the transfer of decedent's assets to the LRFLP as a bona fide sale.[23]  See Estate of Thompson v. Commissioner, 382 F.3d 369, 373-374, 379; Estate of Bigelow v. Commissioner, T.C. Memo. 2005-65; cf. Estate of Bongard v. Commissioner, 124 T.C. at 126-127.  While petitioners also assert on brief that the LRFLP was formed to avoid the burdens and costs associated with giving individual assets to each of the donees, we are unpersuaded by this assertion.  Petitioners did not include this assertion in their issues memorandum as a reason for forming the LRFLP, and it appears to be nothing more than an after-the-fact

---

[23] We note for completeness that we disagree with petitioners' claim that gift giving was an actual reason for the formation of the LRFLP.  In fact, it appears to us that the making of gifts was made harder after that formation.  Before the LRFLP was formed, decedent received monthly brokerage statements that listed the value of the stocks and bonds held at the brokerage firm.  Afterwards, any gift of a limited partnership interest had to be appraised for Federal tax purposes, a process that most likely is more time consuming and expensive than valuing the stocks and bonds directly.  Such is especially so given that the appraisal of the limited partnership interests would almost always include discounts for lack of control and lack of marketability and that the valuation of discounts is a subject on which taxpayers and the Commissioner may reasonably disagree.

espousal made solely to defend their claim to the legitimacy of the transfer.

4. <u>Retention of Possession or Enjoyment of Transferred Property</u>

Petitioners next argue that decedent did not retain the possession or enjoyment of, or the right to income from, the transferred assets after her assets were transferred to the LRFLP. We disagree. We find that decedent transferred her assets to the LRFLP and retained the lifetime possession and enjoyment of those assets pursuant to express or implied understandings and agreements. In other words, we find that the terms and conditions of the transfer of decedent's assets to the LRFLP were not the same as they would have been had unrelated parties been involved in the same transfer. In fact, we find it hard to conceive of unrelated parties' engaging in such a transaction.

Decedent's daughter was decedent's attorney-in-fact, and decedent's children were cotrustees of the Lillie Investment Trust and general partners of the LRFLP. The LRFLP was funded with liquid assets, and decedent's children, as the Lillie Investment Trust's cotrustees, had a fiduciary duty to decedent, in effect standing in her shoes. Given the additional fact that the LRFLP agreement allowed decedent's children, as general partners, to make distributions to decedent when and in the amount they pleased, we conclude that decedent had the same

enjoyment of her assets that she had had before the assets were transferred to the LRFLP.  We find it understood that decedent would receive distributions when and as she needed them.  "The existence of an implied agreement is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property." Estate of Bongard v. Commissioner, supra at 129.  We find such an implied understanding or agreement when we view the conduct of the parties to the LRFLP agreement, as well as that agreement itself.  See Estate of Reichardt v. Commissioner, 114 T.C. at 151; Estate of Rapelje v. Commissioner, 73 T.C. at 86.

First, the LRFLP was not a business operated for profit; it was a testamentary device whose goal was to reduce the estate tax value of decedent's assets.  Before the transfer of decedent's assets to the LRFLP, decedent directly paid her expenses and fulfilled her plan of gift giving.  After the transfer, the LRFLP used the assets received from decedent to pay indirectly the same types of expenses and conduct the same gift giving.

Second, decedent's relationship to her assets did not change following their transfer to the LRFLP and was not treated differently by either decedent's daughter (as decedent's attorney-in-fact) or the general partners of the LRFLP.  Decedent transferred substantially all of her assets to the LRFLP, leaving her few liquid assets on which to live.  Where an individual

conveys all or nearly all of his or her assets to a trust or partnership, the likelihood of an implied agreement allowing the individual to keep using the assets is the greatest. See Estate of Reichardt v. Commissioner, supra at 153; Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46; cf. Estate of Strangi v. Commissioner, 417 F.3d at 477-478. The presence of an implied agreement in such a situation is further revealed where, as here, funds of the LRFLP were used to pay decedent's living expenses, to make gifts to her descendants, and, after her death, to pay the bequests under the Lillie Investment Trust and the expenses of her estate, including, 5 years after her death, her estate taxes. Cf. Estate of Strangi v. Commissioner, 417 F.3d at 477. No funds of the LRFLP were ever distributed to any of the other partners of the LRFLP.

Third, decedent's assets were transferred to the LRFLP on the advice of counsel in order to minimize the tax on the passage of her estate to her descendants. Petitioners assert that the LRFLP was an entity separate from decedent. As stated above, however, the lifetime enjoyment and possession of transferred property may be retained by implied agreement. Decedent transferred her assets to the LRFLP when she was 88 years old and in poor health, and the only other partners of the LRFLP were decedent's children. Decedent's children did not prevent

decedent from continuing to enjoy her transferred assets.  See Estate of Disbrow v. Commissioner, T.C. Memo. 2006-34.

Petitioners assert that the distributions from the LRFLP to decedent were actually loans that did not constitute enjoyment of the underlying funds.  We disagree.  Petitioners bear the burden of proving this assertion.  See Rule 142(a)(1); Frierdich v. Commissioner, 925 F.2d 180, 182 (7th Cir. 1991), affg. T.C. Memo. 1989-103 as amended by T.C. Memo. 1989-393; Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir. 1986), affg. T.C. Memo. 1985-58.  As we understand their factual claim supporting this assertion, neither decedent nor decedent's children foresaw that decedent would incur the amounts of health expenses that she did after her assets were transferred to the LRFLP.  We consider this claim incredible.  When the LRFLP was formed, decedent was nearing 90 years old and suffering from dementia and Alzheimer's disease.  The fact that an elderly individual in such a condition could be expected to incur major health expenses in later years cannot seriously be denied.  Nor can it seriously be denied that decedent enjoyed the capital of the LRFLP for the duration of her lifetime and that decedent's children, as the general partners of the LRFLP, never intended to seek repayment of the "loans" during decedent's lifetime.

Moreover, we disagree with petitioners from a legal point of view.  Debt for Federal tax purposes connotes an existing,

unconditional, and legally enforceable obligation to repay, see Frierdich v. Commissioner, supra at 185; Hubert Enters., Inc. & Subs. v. Commissioner, 125 T.C. 72, 91 (2005), and transfers between related parties are examined with special scrutiny, see Tulia Feedlot, Inc. v. United States, 513 F.2d 800, 805 (5th Cir. 1975); Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970).  A transfer's economic substance prevails over its form, see Byerlite Corp. v. Williams, 286 F.2d 285, 291 (6th Cir. 1960), and a finding of economic substance turns on whether the transfer would have followed the same form had it been between the transferee and an independent lender, see Scriptomatic, Inc. v. United States, 555 F.2d 364 (3d Cir. 1977). The subjective intent of the parties to a transfer that the transfer create debt does not override an objectively indicated intent to the contrary.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314; cf. Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), affg. T.C. Memo. 1983-98.

Whether the withdrawal of funds from an entity by one of its owners creates a true debtor-creditor relationship is a factual question to be decided on the basis of all relevant facts and circumstances.  See Haag v. Commissioner, 88 T.C. 604, 615 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); see also Haber v. Commissioner, supra at 266.  For

disbursements to be bona fide loans, we must find that when the funds were disbursed there was an unconditional obligation and intent on the part of the transferee to repay the money and an unconditional intent on the part of the transferor to secure repayment. See Busch v. Commissioner, supra at 948; Haag v. Commissioner, supra at 615-616; see also Haber v. Commissioner, supra at 266. Direct evidence of a taxpayer's state of mind is generally unavailable, so courts have focused on certain objective factors to distinguish bona fide loans from, among other things, disguised distributions. Although objective factors are most often employed by courts to distinguish debt from equity in the setting of closely held corporations, see Hubert Enters., Inc. & Subs. v. Commissioner, supra at 91-92, we consider them to be most helpful here, accord Gray v. Commissioner, T.C. Memo. 1997-67 (factors used to determine whether a corporation's transfer to a shareholder is a loan rather than a dividend); Miller v. Commissioner, T.C. Memo. 1996-3 (factors used to determine whether a transfer was made with a real expectation of repayment and an intention to enforce a debt), affd. without published opinion 113 F.3d 1241 (9th Cir. 1997). The relevant factors used to distinguish debt from equity include: (1) The name given to an instrument underlying the transfer of funds; (2) the presence or absence of a fixed maturity date and a schedule of payments; (3) the presence or

absence of a fixed interest rate and actual interest payments; (4) the source of repayment; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between creditors and equity holders; (7) the security for repayment; (8) the transferee's ability to obtain financing from outside lending institutions; (9) the extent to which repayment was subordinated to the claims of outside creditors; (10) the extent to which transferred funds were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayment.  See Hubert Enters., Inc. & Subs. v. Commissioner, supra at 92; Recklitis v. Commissioner, 91 T.C. 874, 901-902 (1988); cf. Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 638.  No one factor is controlling, and courts must consider the particular circumstances of each case.  See Busch v. Commissioner, supra at 951; Recklitis v. Commissioner, supra at 905.  Each case turns on its own factors.  See Slappey Drive Ind. Park v. United States, 561 F.2d at 581; see also Busch v. Commissioner, supra at 951.

We analyze and weigh the facts of this case in the context of the relevant factors.

### i.  Name of Certificate

We look to the name of the certificate evidencing a transfer to determine whether the parties thereto intended that the transfer create debt.  Although the issuance of a note weighs

toward a finding of bona fide debt, see <u>Estate of Mixon v. United States</u>, 464 F.2d 394, 403 (5th Cir. 1972), the mere existence of a note is not dispositive.  The issuance of a demand note may not be indicative of genuine debt where the note is unsecured, without a maturity date, and without meaningful repayments.  See <u>Stinnett's Pontiac Serv., Inc. v. Commissioner</u>, <u>supra</u> at 638.

We give little weight to the fact that the record contains note 1 and note 2 (collectively, promissory notes).  Each of the promissory notes was a demand note with no fixed maturity date, no written repayment schedule, no provision requiring periodic payments of principal or interest, no stated collateral, and no repayments by decedent during her lifetime.  The LRFLP also never demanded repayment from decedent or otherwise sought during her lifetime to enforce either note.  The facts that a note is due on demand and that the obligee never demanded payments support a strong inference that the obligee never intended to compel the obligor to repay the notes.  See <u>id.</u> at 640.  Such is especially so where, as here, only one of the promissory notes was prepared during decedent's lifetime despite the fact that numerous payments had been made on her behalf.  Although the payments to the benefit of decedent may have periodically been recorded as "loans", those postings provide little if any support for a finding of bona fide debt.  See <u>Estate of Thompson v. Commissioner</u>, 382 F.3d at 377 n.16; <u>Roth Steel Tube Co. v.</u>

Commissioner, 800 F.2d at 631; see also Estate of Strangi v.
Commissioner, T.C. Memo. 2003-145 ("accounting entries alone are
of small moment in belying the existence of an agreement for
retained possession and enjoyment").

This factor weighs toward a finding that decedent's use of
the funds of the LRFLP did not create bona fide debt.

### ii.  Fixed Maturity Date and Schedule of Repayments

The absence of a fixed maturity date and a fixed obligation
to repay weighs against a finding of bona fide debt.  See Roth
Steel Tube Co. v. Commissioner, supra at 631; Stinnett's Pontiac
Serv., Inc. v. Commissioner, 730 F.2d at 638.

The promissory notes had no fixed maturity date or schedule
for repayment.  While petitioners assert that each note was a
demand note for which payment could have been requested at any
time, LRFLP never made any such demand and, more importantly,
decedent never had the ready ability to honor such a demand if
and when one had been made.  Moreover, despite the lack of any
repayment, the LRFLP continued to allow decedent to use its funds
without any schedule for repayment.  As noted by the Court of
Appeals for the Eleventh Circuit, "an unsecured note due on
demand with no specific maturity date, and no payments is
insufficient to evidence a genuine debt."  Stinnett's Pontiac
Serv., Inc. v. Commissioner, supra at 638.  Such is especially so
where, as here, the choice of whether or when to make demand for

repayment was within the discretion of decedent's children and was not conditioned upon the occurrence of any stated event. See id.; see also Busch v. Commissioner, 728 F.2d at 951.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt.

### iii. Interest Rate and Actual Interest Payments

A reasonable lender is concerned about receiving payments of interest as compensation for, and commensurate with, the risk assumed in making the loan. See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 640; cf. Deputy v. du Pont, 308 U.S. 488, 498 (1940) (in the business world, interest is paid on debt as "compensation for the use or forbearance of money"). The absence of an adequate rate of interest and actual interest payments weighs strongly against a finding of bona fide debt. See Roth Steel Tube Co. v. Commissioner, supra at 631.

Although each of the promissory notes bore interest, the facts of this case persuade us that the parties thereto did not intend that decedent during her lifetime actually pay any (let alone a market rate of) interest for the use of the funds of the LRFLP. We do not believe that a reasonable lender would have lent the funds to decedent, an elderly, infirm woman with minimal assets in her name, at the rate of interest stated in the promissory notes and with the intent to be repaid only after her death. A transferor of funds who does not insist on reasonable

interest payments for the use of the funds may not be a bona fide
lender. See Stinnett's Pontiac Serv., Inc. v. Commissioner,
supra at 640. We also note that decedent during her lifetime
never paid any interest (or principal) to the LRFLP for the use
of its funds.

This factor weighs toward a finding that decedent's use of
the funds of the LRFLP did not create bona fide debt.

### iv. Source of Repayment

Repayment that depends solely upon the success of the
transferee's business weighs against a finding of bona fide debt.
Repayment that does not depend on earnings weighs toward a
finding of debt. See Roth Steel Tube Co. v. Commissioner, supra
at 632; Lane v. United States, 742 F.2d 1311, 1314 (11th Cir.
1984). "An expectation of repayment solely from * * * earnings
is not indicative of bona fide debt regardless of its
reasonableness." Roth Steel Tube Co. v. Commissioner, supra at
631; see also Stinnett's Pontiac Serv., Inc. v. Commissioner,
supra at 638-639; Segel v. Commissioner, 89 T.C. 816, 830 (1987);
Deja Vu, Inc. v. Commissioner, T.C. Memo. 1996-234.

The funds of the LRFLP were used to benefit decedent with no
expectation of repayment from her during her lifetime. In
addition, as to the possibility of repayment, the funds were
placed at the risk of the business of the LRFLP in that
decedent's ability to repay them depended primarily (if not

solely) on the earnings and assets of the LRFLP.  The only way that decedent could have repaid those amounts would have been for the LRFLP to distribute formally some of its earnings to her or to redeem her limited partnership interest at a price greater than the amount reported as due.  While petitioners assert that the "loans" were ultimately repaid in connection with the redemption of the Lillie Investment Trust's limited partnership interest, such a post mortem transaction serves only to strengthen our finding that decedent continued to enjoy the transferred assets up until her death.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt.

### v.  Capitalization

Thin or inadequate capitalization to fund a transferee's obligations weighs against a finding of bona fide debt.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639.

We consider this factor to be irrelevant in the context of this case and give it no weight.

### vi.  Identity of Interest

Transfers made in proportion to ownership interests weigh against a finding of bona fide debt.  A sharply disproportionate ratio between an ownership interest and the debt owing to the transferor by the transferee generally weighs toward a finding of

debt.  See id. at 630; Estate of Mixon v. United States, 464 F.2d at 409.

The only partner of the LRFLP who used its funds was decedent.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt or, at best for petitioners, is irrelevant.

vii.  Presence or Absence of Security

The absence of security for the repayment of transferred funds weighs strongly against a finding of bona fide debt.  See Roth Steel Tube Co. v. Commissioner, 800 F.2d at 632; Lane v. United States, supra at 1317.

The promissory notes were unsecured.  While petitioners claim to the contrary, stressing the fact that the amounts of the "loans" were less than the value of decedent's limited partnership interest, the mere fact that the balance of the transfers was less than the presumed fair market value of decedent's interest in the LRFLP does not necessarily make the transfers secured debt.  Such is especially so where, as here, decedent's daughter conceded at trial that she loved her mother and indicated that she would probably have continued to use the funds of the LRFLP to pay her mother's living expenses as necessary.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt.

### viii. Inability To Obtain Comparable Financing

The question of whether a transferee could have obtained comparable financing from an independent source is relevant in measuring the economic reality of a transfer. See Roth Steel Tube Co. v. Commissioner, supra at 631; Estate of Mixon v. United States, supra at 410. Evidence that a transferee could not at the time of the transfer obtain a comparable loan from an arm's-length creditor weighs against a finding of bona fide debt. See Roth Steel Tube Co. v. Commissioner, supra at 631; Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 640; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287 (1990).

We do not believe that a creditor dealing at arm's length would have lent decedent money under the terms that petitioners allege were entered into between decedent and the LRFLP.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt.

### ix. Subordination

The subordination of purported debt to the claims of other creditors weighs against a finding of bona fide debt. See Roth Steel Tube Co. v. Commissioner, supra at 631-632; Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639.

We do not know whether decedent had any creditors.  Given that the "loans" from the LRFLP were unsecured, however, the right of the LRFLP to repayment would have been subordinate to the interests of any secured creditors.

This factor is either inapplicable or does not support a finding that decedent's use of the funds of the LRFLP created bona fide debt.

### x.  Use of Funds

A transfer of funds to meet the transferee's daily needs weighs toward a finding of debt.  See Roth Steel Tube Co. v. Commissioner, supra at 632; Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 640.

Decedent's daughter (as decedent's attorney-in-fact) used the funds of the LRFLP to meet decedent's daily needs.  But for those funds, those needs most likely would have gone unsatisfied.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt or, at best for petitioners, is irrelevant.

### xi.  Presence or Absence of a Sinking Fund

The failure to establish a sinking fund for repayment weighs against a finding of bona fide debt.  See Roth Steel Tube Co. v. Commissioner, supra at 632; Lane v. United States, 742 F.2d at 1317.

Decedent did not establish any fund to repay the promissory notes.

This factor weighs toward a finding that decedent's use of the funds of the LRFLP did not create bona fide debt.

### xii. Conclusion

On the basis of our review of the record in light of the relevant factors,[24] we find it extremely improbable that an arm's-length lender at the time of each use of the funds of the LRFLP would have lent unsecured, at a low rate of interest, and for an unspecified period to an individual in decedent's financial condition and with decedent's weakened health. Security, adequately stated interest, and repayment arrangements (or efforts to secure the same) are important proofs of intent, and such proofs are notably lacking here. Economic realities require that decedent's use of the funds of the LRFLP be characterized as distributions to decedent, and we so hold.

## 5. Effect of Section 2035(a)

Petitioners next argue that the Court, if we conclude that the assets are includable in decedent's gross estate under section 2036(a)(1), must exclude from those assets the portion

---

[24] In addition to the factors mentioned above, we note that no contemporaneous records were kept as to the payments other than the recordings in the checkbook registers. We consider the lack of more formal documentation to be especially notable given that decedent's son-in-law prepared and kept detailed documentation for all of the gifts before 1995.

thereof that relates to the limited partnership interest that decedent transferred by gift more than 3 years before her death. We disagree.  Petitioners' argument, as we understand it, is that this Court in Estate of Bongard v. Commissioner, 124 T.C. at 131-132, concluded that section 2035(a), which pertains to assets transferred by gift within 3 years of death, limits the reach of section 2036(a)(1).  Petitioners are mistaken.  Decedent continued to possess and enjoy the transferred assets up until her death.  Accordingly, section 2036(a)(1) includes those assets in her gross estate.

6.  Epilog

    We hold for respondent.  We have considered all arguments by petitioners for a contrary holding and find those arguments not discussed herein to be without merit.  To reflect the parties' concessions,

Decisions will be entered

under Rule 155.